1
            UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF VIRGINIA
2                  ALEXANDRIA DIVISION

3      -----------------------------x
                                    :
4      UNITED STATES OF AMERICA     :
                                    :
5            versus                 : Criminal Action Number
                                    :
6      ARDIT FERIZI                 : 1:16-CR-42
                                    :
7                  Defendant.       :
       -----------------------------x
8
                                    Washington, D.C.
9                                   September 23, 2016

10          The above-entitled jury trial was continued
       before the Honorable Leonie M. Brinkema, United
11     States District Judge.

12          THIS TRANSCRIPT REPRESENTS THE PRODUCT
            OF AN OFFICIAL REPORTER, ENGAGED BY THE
13          COURT, WHO HAS PERSONALLY CERTIFIED THAT
            IT REPRESENTS TESTIMONY AND PROCEEDINGS OF
14          THE CASE AS RECORDED.

15

16

17

18

19

20

21

22

23

24

25

                                                          1

1                           A P P E A R A N C E S

2        FOR THE GOVERNMENT:

3                    UNITED STATES ATTORNEY'S OFFICE
                     **Brandon VanGrack, Esquire.**
4                    **Gregory Gonzalez, Esquire.**
                     2100 Jamieson Avenue
5                    Alexandria, VA 22314
                     703-299-3700
6                    Email: Brandon.van.grack2@usdoj.gov

7

8        FOR THE DEFENDANT:

9                    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                     **Elizabeth Mullin, Esquire.**
10                   **Geremy Kamens, Esquire.**
                     Assistant Federal Public Defender
11                   Office of the Federal Public Defender
                     1650 King Street, Ste 500
12                   Alexandria, VA 22314
                     703-600-0879
13                   Elizabeth_mullin@fd.org

14

15

16

17       OFFICIAL UNITED STATES COURT REPORTER:

18                   MS. TONIA M. HARRIS, RPR
                     United States District Court
19                   Eastern District of Virginia
                     401 Courthouse Square
20                   Tenth Floor
                     Alexandria, VA 22314
21                   763-443-9034

22

23

24

25

                                                              2

<u>**P R O C E E D I N G S**</u>

1

2

3          THE DEPUTY CLERK: Criminal case number

4     1:16-CR-42, United States versus Ardit Ferizi.  Would

5     counsel please note their appearances for the record?

6          MR. VAN GRACK: Good morning, Your Honor.

7     Brandon Van Grack and Gregory Gonzalez on behalf of the

8     United States.

9          THE COURT: Good morning.

10          MS. MULLIN: Good morning, Your Honor.  Elizabeth

11     Mullin and Geremy Kamens on behalf Ardit Ferizi.

12          THE COURT:  We'll have our interpreter confirmed

13     while we're waiting for the defendant.

14          (Interpreter sworn.)

15          THE COURT:  Ms. Mullin, who is going to be

16     speaking for the defendant?

17          MS. MULLIN:  I am, Your Honor.

18          THE COURT:  All right.  So have you had enough

19     time to go over the presentence report yourself and with

20     your client?

21          MS. MULLIN:  Yes, Your Honor.

22          THE COURT:  All right.  Are there any factual

23     corrections, additions, deletions of any sort you want to

24     make to the report itself?

25          MS. MULLIN:  No, Your Honor.

3

1              THE COURT:  All right.  Now I know there's some

2       dispute about how the guidelines were calculated.  The

3       probation office has calculated the offense level here as

4       a level 40.  Because your client has received the

5       terrorism enhancement under 3A1.4 of the guidelines, his

6       criminal history is ranked at a level six.  That

7       establishes an advisory guideline range of 360 months to

8       life.  Although, the statutory maximum is 20 years of the

9       offense.

10             There are two counts of conviction here:  Count

11      two, which is a material support count has a supervised

12      release term ranging from one year to life.  The unlawful

13      access to computer, which is Count 3, the supervised

14      release range there is one to three years.  The fine range

15      here is $25,000 to $250,000 and there's a 100 to 200

16      dollars of special assessments because there are two

17      counts of conviction.  Correct?

18             MS. MULLIN:  Correct.

19             THE COURT:  I'll hear first from the United

20      States.

21             MR. VAN GRACK:  Your Honor, in this case the

22      Government is seeking a sentence of 25 years, which is the

23      most permitted by statute, because the defendant's conduct

24      has definitely put the lives of 1300 military members and

25      Government employees at risk.

                                                              4

1              With the Court's permission, I would like to

2       focus first on the 3553 factors because the guidelines,

3       with one or two exceptions, are largely in agreement but

4       there are significant disagreements between the parties on

5       those 3553 factors.

6              THE COURT:  All right.

7              MR. VAN GRACK:  And I think reading these two

8       position papers, it would almost seem like you're dealing

9       with two different individuals and two different crimes.

10      The Government represents that this is an individual who

11      is a hacker who used those skills to support a terrorist

12      organization and has put these 1300 lives at risk for the

13      foreseeable feature.

14             The defense counsel is representing that this is

15      simply a hacker who made a single mistake, was on drugs,

16      and didn't realize what he was doing.  And these two

17      images -- there's no middle ground in terms of what the

18      defendant's conduct was.

19             And so I would like to first discuss one of the

20      representations in terms of the defendant's motive

21      represents in his letter to the Court that he was not an

22      ISIL supporter, he was not loyal to ISIL.  But that's

23      disconnected with the facts in this case and those facts

24      come directly from the defendant's actions and his words.

25             In April 2015 he on his own develops a Website

1    to post ISIL videos and other propaganda.  This isn't a

2    single instance, this is not something that on a single

3    day he just developed.  He registers this Website, he

4    creates the infrastructure for the Website, he ensures

5    that it is able to post these videos, he has

6    communications with members of ISIL without this Website.

7    It's not just the creation of the Website, it is his words

8    with respect to that Website.

9         The Government provided some excerpts of

10   communications that the defendant had with individuals who

11   were against ISIL and challenged the defendant on why he

12   was allowing the Website -- why he was supporting the

13   Website that posted these videos.  And it is actually --

14   even though the Government only provided a few

15   conversations, these are debates, these are conversations

16   with multiple individuals that occurs over a lengthy

17   period of time.  And in these conversations the defendant

18   is constantly supporting ISIL, defending ISIL when

19   challenged about beheadings.  He explains that ISIL

20   wouldn't kill someone without justification.

21        Most importantly, there's a discussion where he

22   is challenged about a posting in March of 2015 by a group

23   called the Islamic State Hacking Division and a well known

24   ISIL recruiter and facilitator named Junaid Hussain.  And

25   in that post there was a kill list listing 100 service

6

members and their addresses.  And this individual

challenges the defendant on the justification why -- "How

could you justify this behavior?"  And the defendant says,

"Well those people, the U.S. Military, they're the ones

who are killing people in Iraq and Syria."

Perhaps what's most important about those

communications are that these are private communications.

This isn't something that was posted in a public forum.

This isn't something that was forwarded to ISIL.  These

are communications with multiple people where no one else

is aware of what he's saying.  And yet, in these

conversations, if he wasn't an ISIL supporter, he didn't

have to respond to them.  He could have said, "Well, I was

high one day.  I didn't know what I was doing."  But

instead he has a vigorous defense of ISIL in each and

every instance.

But it's not just the Website, as the Court is

aware, because during that period of time after he creates

this Website he decides that he wants to ratchet up that

support to ISIL to actually figuring out a way to assist

in their task, to assist in this harm.  And so on June

13th he hacks into a companies Website.  And on his own,

as he's looking through this data, he's trying to figure

out what information here can help ISIL.  And he knows

this already because he's seen the videos.  He saw that

7

March 2015 post from Junaid Hussain that had this kill list of 100 service members.  He's aware of the statements that ISIL has made before.  And so as he's looking through this customer data base, in his mind is, "What can I do to support ISIL?"  And so on his own he looks for e-mail addresses that end in .gov and .mil.  And he codes that information to identify ultimately the 1300 individuals who are members of the military and U.S. Government.  And as soon as he finds this information the first thing he does he reaches out to ISIL, he reaches out to Junaid Hussain.

And again, it's not just his actions but his words.  And the Government provided a transcript of those conversations that he had with Junaid Hussain.  And it's clear from those conversations what Junaid Hussain and Ardit Ferizi was going to do with this information.  They talk about creating a hit list, that this information would hit them hard.  To the extent there's any doubt in the defendant's mind of the purpose of what this information is, it's answered in that conversation with Junaid Hussain.

Defense counsel represents that this was again the defendant just bragging, that he just wanted to show off his hacking skills.  But the conversation with Junaid Hussain did not only occur on June 13th.  The

8

conversations continued days after.  They continue to talk

June 14th, June 15th trying to verify that this

information is accurate.  The defendant on his own reaches

out to Junaid Hussain, wants to know how things are in the

Islamic State.  And I think it's telling that on the day

that the Islamic State Hacking Division and Junaid Hussain

posted this information on August 11th, an individual

reaches out to Junaid Hussain and asks about the

whereabouts of Ardit Ferizi.  And Junaid Hussain says,

"He's been busy.  He's on our team."  And it is indicative

of the fact that this isn't something where the defendant

simply passed information and walked away, but this is a

collaboration.  This is an effort between Junaid Hussain

and Ardit Ferizi to harm these individuals.

            The defendant, to justify his actions, explains

he asked the Court to believe a story in which there is a

journalist who wrote a false story about his support for

ISIL and he was mad, he was embarrassed he says that this

story falsely accused him of supporting ISIL.  And so he

goes to the U.S. Embassy and finds that the U.S. Embassy

is unable to assist him.  And that's the genesis of his

support for ISIL.

            The Government submits that this is just a

nonsensical explanation.  He asked the Court to believe

that he supported ISIL because he was so mad at being

9

1    falsely accused of supporting ISIL.  It's indicative of

2    the defendant not taking responsibility for his conduct

3    and misrepresenting the motives for his conduct.  But,

4    motives are one piece.  The perhaps even larger piece here

5    is the actual harm.  There's again a large gap between the

6    Government's representations as to who was harmed and how

7    they were harmed in the defense counsel's representations.

8            And in this case, as the Government represents,

9    the information here on these 1300 people, this wasn't

10   publicly available information.  A lot of this information

11   -- in fact there's no evidence at all in the record that

12   this information, all this information was public.

13   There's no question that some of that information is

14   publicly available.  There's also no question that on the

15   Internet there's lots of information about us that maybe

16   perhaps we would otherwise not want to be available.  But,

17   that's not the facts in this case.

18           Even if they were, Your Honor, even if all this

19   information was publicly available, it misses the point

20   that all the information that was necessary was

21   information that would identify the person, who they

22   worked for, and where they lived because this was a hit

23   list.  The point of this list was to find these

24   individuals and harm them, "to strike out their nets."

25   Those are Junaid Hussain's words.  And so, even if -- the

                                                          10

defense counsel says, "Well, there weren't social security numbers."  This wasn't about stealing money from these people.  This is about finding them and harming them.

And the defendant, in terms of the value of this information, it's clear from the defendant's own words and his own actions he says in his letter to the Court that when he saw the post he felt bad for these people because they were so scared.  Well, if this information wasn't sensitive why were they scared.  What were they scared of if this information was just floating on the Internet and they were fully aware of it?

And in fact from his conversations with Junaid Hussain it's the same thing.  When the defendant finds this information and provided it to Junaid Hussain, Junaid Hussain doesn't say, "Well, thanks I have a few hundred other names I'm working on, but I'll get to your list. He's excited about it.  His reaction.  And the Court has seen those conversations.  This is something where this is a big deal.  They are aware of the fact that this information is information that would be useful for people who are unable to travel to a war zone and are seeking to do harm here in the United States.

And this entire conversation on what the information is it misses an even larger point, because it's not what the information is but what they did with

11

1    the information.  Which is, ISIL took these names and told

2    the supporters to find them and harm them.  They have

3    permanently put a target on the backs of these

4    individuals.  And so, the truth is if anyones name and

5    their location is on something called an "ISIL hit list,"

6    an "ISIL kill list," that alone is enough to invoke fear

7    rightly so in those individuals.

8            This isn't a hypothetical situation.  Even in

9    this district there's already been someone who was

10   arrested for admitting for the fact that he drove by the

11   homes of two individuals in Virginia whose names and

12   addresses were on the kill list that Junaid Hussain posted

13   in March of 2015.  And the notion that again it's just the

14   name, it's just a posting, is, I think, captured by one of

15   the victim letters.  Obviously I won't say the individuals

16   name, but the individual says that she now lives in the

17   state of fear when she interacts with Muslims and she

18   feels guilty about that but she doesn't know exactly

19   what -- when this harm will go away.  And most importantly

20   in that letter she doesn't decry the fact that her e-mail

21   address was used or phone number.  She says that its her

22   name.  She says that she has a unique last name that just

23   knowing that ISIL has marked her, just knowing her name is

24   enough for an individual to find and locate her.

25           This disconnect between the harm that the

                                                        12

1    defendant's conduct has caused and between the parties, I

2    think, also drives their references to similar situated

3    defendants, similar sentences.  And as the Government can

4    see, this is not a case that is easy to button hold it,

5    easy to compare to other cases.  And part of that is

6    because of the number of victims.  It is rare that you

7    have a case where there are this number of individuals who

8    have been directly harmed by an individuals conduct.  And

9    part of it is also because of the medium he used.  We're

10    used to situations where an individual here in the United

11    States commits some sort of -- facilitate some kind of

12    violent act or travel to a war zone.  And because the

13    individual used his hacking skills into a computer he was

14    thousands of miles away.  But that doesn't change the fact

15    that at the core of what he did was provide information

16    that would allow others to facilitate an attack.

17         One of the cases that seems most analogous is

18    the *Chesser* case, which was here in this District where

19    the individual was sentenced to 25 years.  And there were

20    a number of ways the individual provided support to ISIL

21    as there is in this case.  But one of the main things that

22    *Chesser* did was provide information on nine individuals

23    and instruct people to go kill them.  And one of the main

24    differences is, whereas there were nine victims in the

25    *Chesser* case, here there are 1300.

1           There's another case in the Western District of

2    New York, *Elfgeeh*, E-L-F-G-E-E-H.  In which an individual

3    a few months ago was sentenced to 22-and-a-half years.

4    And like the defendant the individual posted propaganda.

5    He also attempted to facilitate the travel of three

6    individuals to Iraq and Syria.  Two of those individuals

7    were working, I believe, as FBI sources and never

8    travelled.  But again, you have a comparison of a

9    facilitation of an attack that's someone who was located

10   here but is still a facilitation.

11          The cases that the defendant talks about, I

12   believe *Farrokh* and *Amin* are two of those cases.  In each

13   of those cases there are no victims.  There are no victims

14   that are identified in any case.  For *Farrokh*, an

15   individual who was trying to travel to Iraq and Syria.  He

16   never travelled there.  No one was harmed by his conduct.

17   That's not to say his conduct wasn't serious.  But again,

18   in this case we have 1300 victims.

19          I would like to just briefly talk about some of

20   the characteristics of the defendant.  Although it was in

21   our position paper, there are two points that were not

22   there that I would like to stress before the Court.  One

23   concerns the acceptance of responsibility.  And I think

24   it's a key point reading the defendant's letter to this

25   Court, because it is indicative of someone who has failed

                                                            14

1    to accept responsibility for his conduct.  He blames

2    drugs.  He discusses this being sort of a momentary laps

3    of judgment and the facts are to the contrary.  And he

4    also comes up with really a nonsensical story to explain

5    why he got involved in ISIL in the first place.

6          The second point the Government would like to

7    raise concerns his criminal history.  And in his

8    submission paper he discusses that in 2013 he was in

9    trouble for hacking a Kosovo Government database and

10   received an alternative sentence.  And we would like to

11   submit to the Court what the Government has marked as

12   Government Exhibit 1.  It's been provided to defense

13   counsel before.  And I would not read from this document

14   because it concerns -- if I may.  Thank you.

15         THE COURT:  And you're filing it under seal?

16         MR. VAN GRACK:  Yes, Your Honor.  It's a

17   document from the Kosovo police.  And in it it details 10

18   different incidents, criminal incidents, involving the

19   defendant.  And the point of this is not to get into each

20   of those details, because the Government isn't fully aware

21   of those details.  But it's to bring to the Court's

22   attention that this is not someone who just in a single

23   instance hacked a Government database and was in trouble.

24   This is someone who, over multiple years, was engaged in

25   multiple actions including criminal activity more than

                                                        15

1     just hacking into a Government database.

2          And one of the reasons we bring this to your

3     attention, Your Honor, because one of the representations

4     in the defendant's position paper is that he is unlikely

5     to reoffend.  Well, the point is he's already reoffended

6     over and over and over again.  The defendant was already

7     given a second chance.  He received an alternative

8     sentence.  And he took that chance and instead he engaged

9     in hacking again but this time that hacking actually

10    harmed individuals.

11          THE COURT:  All right.  Just so I can understand

12    this exhibit.  It appears as though it addresses incidents

13    going back to 2011.  Is that -- am I reading that

14    correctly?

15          MR. VAN GRACK:  Yes, Your Honor.  And

16    admittedly, a lot of this is in Albanian.  But there's

17    enough in English, I think, to get the point across.

18          THE COURT:  The point is he would have been 15

19    years old at the time.

20          MR. VAN GRACK:  The reason why this is under

21    seal, all of this conduct was when he was a juvenile,

22    which is why we're not getting into the specifics of that

23    conduct.

24          THE COURT:  All right.

25          MR. VAN GRACK:  Your Honor, to briefly talk

                                                      16

about the guidelines.  As the Court has already reported,
the probation office has calculated them to be an offense
level 40 and criminal history six, which the Government
agrees with.

There appear to be two points, two issues that
the defense counsel has with respect to that calculation.
The first is that there should not be two points awarded
-- a two level adjustment under 2M5.3, because the
defendant didn't intend or has reason to believe that his
support would cause a violent act.  And I think the
Government has addressed that in its prior points.

The larger question that defense counsel raises
is they seek a downward departure under 4A1.3.  Arguing
that the criminal history six overstates the defendant's
criminal history.  The Government's position is that this
downward departure should not be applied to terrorism
cases.  Under 3A1.4 in the terrorist enhancement,
individuals whose conduct is connected to a crime of
terrorism automatically received this bump to criminal
history number six.  And the downward departure in 4A1.3,
the factors the Court are to consider is whether it
overstates their criminal history or overstates their
ability to reoffend.  Well, that's almost every terrorist
because they are automatically moved to criminal history
six.  And so under the defense counsel's interpretation in

17

1    almost every terrorism case, it eliminates that automatic

2    enhancement.  And so it actually eliminates the entire

3    purpose of that enhancement was to identify the

4    seriousness of a terrorism offense.

5         But even if the Court believes that it can be

6    applied in a terrorism case, the Government's position is

7    this is not the case for a downward departure to be

8    applied.  This is an individual that has permanently put

9    the lives of 1300 individuals at risk and this is also

10   someone who has shown that he is a reoffender and someone

11   who is likely reoffend again.  And for this reason the

12   Government ask that he be sentenced to 25 years.  Thank

13   you.

14        THE COURT:  Okay.  Thank you.  Ms. Mullin.

15        MS. MULLIN:  Your Honor, if it's okay I'll start

16   with the 3553(a) factors as well.

17        Your Honor, Mr. Ferizi wants the Court to know

18   that he renounces ISIL, he has never been loyal to ISIL,

19   and he does not embrace what ISIL stands for.  Throughout

20   this process from his extradition from Malaysia to this

21   country and up until here today he has expressed nothing

22   but respect for the laws of the United States.

23        It is important to remember that Mr. Ferizi was

24   just a teenager when he committed these offenses and he is

25   now doing everything he can to return to his family and

18

his community in Kosovo, who as the Court can see from the letters submitted, love him and are waiting for him to return.

Now Mr. Ferizi doesn't dispute that he was active online.  And he spent most of his days online in his dorm room in Malaysia.  And he doesn't dispute that he made hyperbolic comments about ISIL to members of ISIL and that he was interested in ISIL.

He also pursued pedophiles online, communicated with romantic interest and donated to the Democratic party of the United States.  We submit that his online activities, though they do events a juvenile who was bragging and showing off and trying to feel cool, we submit that his online activities show that he was not motivated by radical ideology.  And indeed he never planned to go fight for ISIL as many materials support defendants do.  He never made any real plans to fight or to do anything other than sort of his virtual communications with ISIL.  In fact, he rebuffed invitations to go fight in Syria.

Now the Government calls his explanation for his conduct nonsensical.  We agree it is nonsensical.  It is a nonsensical because he was a confused teenager with confused motivations.  The Government doesn't dispute that there was a journalist in Kosovo that posted a piece about

19

1    Mr. Ferizi saying he went to go fight in Syria.  This

2    deeply embarrassed his family.  And the Court can see that

3    from the letters from Mr. Ferizi's mother and father they

4    were embarrassed, they were ashamed.

5             Mr. Ferizi had just started a new university as

6    a freshman, or their version of a freshman.  He's 18 or 19

7    years old, he feels his social life is ruined, people are

8    laughing at him and calling him a terrorist.  And so, his

9    motivation was nonsensical.  It was a completely

10   nonsensical juvenile, unconsidered response to then go and

11   assist ISIL in the way he did and to sort of communicate

12   with ISIL as a way to, in his mind, get back at the United

13   States Embassy for not removing the smear post.  And so it

14   was nonsensical because he was a nonsensical misguided

15   teenager who really didn't know what he was doing.

16            And so it's not that he's not -- he's not

17   accepting responsibility.  He accepts responsibility for

18   his actions, but that truly is his explanation for what he

19   did.  And the Government is right it doesn't make sense

20   because he was a juvenile.  And so that was his motivation

21   underscores that he really truly wasn't motivated by a

22   deep-seated radical ideology.

23            Your Honor, in any case involving material

24   support of a designated terrorist group like ISIL, it's

25   not hard because of the horrible offenses perpetrated by

                                                    20

1    ISIL to assume the worse about a defendant and evaluate

2    his conduct by imagining the worse possible outcome that

3    could result from it no matter how remote the risk of that

4    outcome is.  And that's essentially what the Government

5    has done by stating that these 1300 victims, whose e-mail

6    address were sent, are marked as enemies of ISIL.

7            THE COURT:  Well, how do you address the

8    argument that here in Northern Virginia there apparently

9    has been evidence that -- that people on this list or at

10   least one person on this list, has in fact felt actual

11   threats?

12           MS. MULLIN:  This is -- we don't dispute that

13   the victims experienced fear and will continue to.  And

14   Mr. Ferizi has apologized for that and he will and he

15   should be punished for that.  However, the reality of it,

16   if you look at what he did calmly and soberly, but the

17   reality of the information he sent really could not

18   facilitate an individual specific attack.  He did not send

19   addresses.  He did not send home addresses.  He did not

20   send work addresses.  He did not send specific whereabouts

21   as to where these people might be in any given day.

22           As so, he did send passwords, but of course that

23   information is moot now as the passwords has been changed.

24   So, while the individuals rightly and understandably

25   experience fear, the information that he sent, if you

21

1    really think about it, could not anymore than any other

2    information out there in the world, could not facilitate

3    or assist in a specific attack on any one individual.  The

4    value of the material that he sent is in its propaganda's

5    message.  And I think that there's a distinction there in

6    that what he did supported propaganda, but what he did not

7    support or facilitate or wasn't even able to facilitate a

8    specific violent attack.

9        And so that distinction, I think, is important

10   when we think about material support cases because it's

11   different than someone who targets a location and gives

12   specific information that can assist in an actual physical

13   attack on an individual on a specific location.

14       So what he gave essentially -- I mean anyone can

15   look on the Internet and find a name.  And unlike Adam

16   Chesser he didn't send an address or a where about, or a

17   time, or a method.  And so I think there is a distinction

18   there when you really consider the information he sent and

19   the value of it.

20       Again, Mr. Ferizi does not mean to undermine the

21   fear that the victims experienced.  I don't think I -- I

22   take issue with the idea he hasn't accepted

23   responsibility.  He has in many ways and in many ways that

24   are submitted in our under sealing filing, in our redacted

25   filing.  And he will be punished for the harm that he

                                                          22

1    committed, which is the psychological harm and the

2    propaganda value of the information or message that he

3    sent.  But I submit that he shouldn't be punished for a

4    harm that he has not caused, a speculative and remote

5    harm.

6            Materials support an extraordinary broad statute

7    and it encompasses an extraordinarily broad amount of

8    conduct.  And in some cases defendants who are convicted

9    commit specific acts of violence themselves or intend to

10   go fight for -- intend to fight in Syria for ISIL or

11   elsewhere and seek to join terrorist groups.

12           This is not one of those cases.  Mr. Ferizi was

13   existing in a totally virtual world.  He was a teenager.

14   He never intended to fight for ISIL.  He never intended to

15   commit or assist in a violent attack on any one

16   individual.  And for those reasons we submit that the

17   sentence we requested of 72 months is appropriate.

18           Briefly, with respect to the guidelines, we

19   agree that the terrorism has been applied technically.

20   However, there's nothing in the guidelines to suggest that

21   4A1.B3 would preclude the Court from granting a downward

22   departure in terrorism cases.  And while Mr. -- Mr. Ferizi

23   has never disputed that he engaged in hacking activities

24   as a youth, as a juvenile, in Kosovo, as the Court knows,

25   he didn't serve any time for those.  So technically under

23

1   the guidelines he would be in category one.

2              Additionally, Your Honor, the reason why I think

3   4A1.3 could apply to terrorism cases is because the

4   terrorism enhancement itself is so broad.  It clumps

5   together all defendants accused of terrorism regardless of

6   distinctions in their level -- the level of their material

7   support, the quality of their material support, the

8   duration of their support of a terrorist organization.

9   And so that's why I think that a guideline such as 4A1.3

10  does apply in cases where the terrorism enhancement is so

11  draconian and so broad as to sweep all defendants accused

12  of terrorist activity into its net.

13             All right.  Thank you.

14             THE COURT:  All right.  Are there any victims

15  who want to be heard?

16             For the record, the Court has reviewed the

17  numbers of letters that were submitted by the Government

18  in supports of its position as well as the letters that

19  were submitted on behalf of Mr. Ferizi.  All right, Mr.

20  Ferizi come up to the lectern.

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  This is your opportunity to say

23  anything you would like the Court to consider before the

24  sentence is imposed.

25             THE DEFENDANT:  Yes, Your Honor.  I feel so bad

                                                            24

1  for what I did.  I take full responsibility for that.  And

2  I'm very sorry for what happened for making people scared.

3  So that's what I have to say.

4          THE COURT:  Do you have any true understanding

5  of what you actually did?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  And I'm still not sure.  Why did you

8  do it?

9          THE DEFENDANT:  I don't know, Your Honor.  Doing

10  something fast.  It wasn't something like -- it was

11  something -- happened very fast.

12          THE COURT:  It didn't happen that fast.  You're

13  communicating back and forth over a period of time, aren't

14  you?

15          THE DEFENDANT:  Yes, Your Honor.  It's coming

16  from 2015.  Usually it starts in March.  I started to chat

17  with a girl.  She was supporting ISIS online and then I

18  got involved in -- in their chats.  So, yeah.

19          THE COURT:  Well, this was a case where it

20  wasn't a one time incident.  You had plenty of time to

21  think about what was going on.  Now I am not insensitive

22  to the fact that you're only 20 years old.  You obviously

23  have a certain talent for working on the computer.  You've

24  been able to hack into Government databases at least since

25  the age of 15.

                                                    25

1              And I think your youth and also the significant

2      mental health information, which was provided by the

3      Government, are factors that it is appropriate for the

4      Court to consider.  At the same time you are 20 years old

5      so you're not a child any longer.  And you had the

6      opportunity when you had those first rounds of issues with

7      the courts in Kosovo to have this issue addressed.

8              I recognize that there's much science these days

9      that the brain of human beings is not fully developed

10     frankly until people are in their mid-20's which explains,

11     in some peoples eyes, the reason why younger people tend

12     to be involved in a lot of criminal activity.

13             But, that can't excuse this kind of conduct.

14     And I think the Government's representations about the

15     impact that this kind of conduct had on 1300, absolutely

16     innocent, victims cannot be ignored by the Court.  It's

17     also extremely important to send messages to other young

18     people like yourself who has skills with computers that

19     playing around with computers is not a game.  The hacking

20     into computer systems is becoming a major problem

21     throughout the world.  And in fact, you know, cyber

22     warfare has become almost the latest and most serious area

23     of concern for many people in Government.

24             And so what you did was extremely serious.  And

25     the Court feels that the sentence has to reflect that.

                                                              26

1    And so, I am going to impose a sentence that is a slight

2    variance from the guidelines.  I'm going to accept the

3    guidelines as they've been calculated, because I think

4    they are correct given the facts of this case.  But,

5    because of your youth and what are some real serious

6    mental health issues, some minor variance is appropriate.

7    Not merely as much as defense counsel requested, however.

8              The Court also did look at comparators.  The

9    ones that the Government and defense counsel gave the

10   Court.  I agree with the Government that the comparators

11   whom the defense identified *Amin*, *Farrokh*, and *Coffman*

12   none of those cases involved third party victims the way

13   this one did.  And although the defense has argued that

14   the victims are not victims as -- as much as in the other

15   case that the Government has cited, just having your name

16   on a list knowing that you've been identified to a

17   terrorist group, in my view, is sufficiently terrorizing

18   for those people on the list.  And their letters certainly

19   attest to that fact.

20             And the one person who has a very unique name,

21   in particular, mentions that maybe the only name in that

22   particular area would make it very easy to find that

23   person.  And the fact that they are basically on a hit

24   list making them basically targets is very, very serious.

25             Because of the need, among other things, for

27

1    general deterrence, the need to make sure this defendant

2    is deterred from such future conduct, given his track

3    record going back five or six years with hacking, the

4    Court is satisfied that a total sentence of 240 months is

5    sufficient but not greater than necessary to achieve the

6    purposes of Section 3553(a).  That sentence is composed of

7    180 months on the material support count to be followed by

8    60 months consecutive on the unlawful access to protected

9    computer information for a total of 240 months.

10         Now the defendant will be given credit for the

11   time he has been serving since October 12, 2015 when he

12   was arrested in Malaysia.  At the completion of the 240

13   month sentence, the defendant will serve a period of 10

14   years of supervised release on Count 2 and a period of

15   three years of supervised release concurrent on Count 3.

16         The terms and conditions of your supervised

17   release, Mr. Ferizi, are first of all your uniformed good

18   behavior.  That means you're not to violate any federal,

19   state, or local laws while on supervision.  Do you

20   understand that?

21         THE DEFENDANT:  Yes, Your Honor.

22         THE COURT:  Secondly, you have to comply with

23   all of the conditions of supervision, which will be

24   explained to you by the probation office and explained to

25   you by them as well.  Do you understand that?  And it will

28

1     be on the judgment order.  Do you understand?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  Now there are a series of special

4     conditions.  The first is, you will have to satisfactorily

5     participate in such mental health treatment as directed by

6     the probation office with an emphasis on

7     deradicallization.  You will have to take any medication

8     and submit to any programs as directed by the probation

9     office.  You must waive privacy rights that you have to

10    the mental health treatment so that probation officers can

11    monitor your progress and the Court will waive any cost of

12    that program.  Do you understand that?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Secondly, you must be drug free.

15    You will have to submit to drug testing in such in or

16    outpatient drug treatment as the probation office directs.

17    Do you understand that?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  You have to waive any privacy rights

20    that you have to the drug treatment program so it can be

21    monitored by the probation office and the Court will again

22    waive the cost of that program.  Do you understand?

23             THE DEFENDANT:  Yes.

24             THE COURT:  You are not permitted to have any

25    contact or communications whatsoever with any known

                                                              29

1    terrorist, terrorist organizations, or any known hackers.

2    If it is determined that you have had such communication

3    whether it's by the Internet, by telephone, by letter in

4    any respect, you're in violation.  Do you understand that?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  You cannot possess or use any

7    computer without having received permission from the

8    probation office and you will have to submit to such

9    monitoring technology as exist at the time you're released

10   so that the probation office can monitor any

11   communications you might have.  Do you understand that?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  All right.  And lastly, you have

14   to comply with any orders from the immigration authorities

15   as to your deportation.  Do you understand that?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  If deported from the United States,

18   you are not allowed back in this country for any reason

19   whatsoever during that 10 year period.  Should you return

20   to the United States in that 10 year period, you will have

21   two problems:  One, you're in violation of this Court's

22   sentencing order and could be sentenced back to prison for

23   up to 10 years.  Do you understand that?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  And secondly, the Government could

                                                              30

1    prosecute you for a new and separate crime called "illegal

2    reentry after deportation" with a violent felony

3    conviction on your record.  Do you understand that?

4              THE DEFENDANT:  Yes, Your Honor.

5              THE COURT:  The Court finds, given your

6    financial situation -- oh, there is an issue about

7    restitution in this case, isn't there, from the victim?

8              MR. VAN GRACK:  Yes, Your Honor.

9              THE COURT:  Is there a restitution order that's

10   been prepared?

11             MR. VAN GRACK:  No, it has not been prepared,

12   Your Honor.

13             THE COURT:  Was there a reason why it is not

14   done?

15             MR. VAN GRACK:  No.  Unfortunately, the victim

16   information, the specific victim information was late in

17   being passed to the probation office and so the Government

18   has not --

19             THE COURT:  What's the Government's position?

20   My understanding it was in the plea agreement.  Wasn't

21   there an agreement to the restitution?

22             MR. VAN GRACK:  Well, in the statements of facts

23   as well, Your Honor, I believe it is not contested.  It

24   was over $40,000 in damages.

25             THE COURT:  The amended petition which has, I

                                                          31

1    think, $100,000 for good will, I would not find

2    appropriate.  I don't think it's adequate documentation

3    for the good will issue, is there?

4              MR. VAN GRACK:  The Government will agree with

5    that position, Your Honor.

6              THE COURT:  All right.  Ms. Mullin, have you had

7    a chance to discus the restitution issue with your client?

8              MS. MULLIN:  Yes, in general terms.  I will do

9    so when a restitution order is submitted.

10             THE COURT:  Is that going to be done today, the

11   restitution order?

12             MR. VAN GRACK:  Yes, Your Honor.

13             THE COURT:  All right.  I want to make sure we

14   get that taken care of.  And Mr. Ferizi, you understand

15   than an additional condition of your supervision is that

16   you're going to have to make a good faith effort to repay

17   that money to the Arizona company whose computers you

18   hacked?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  That's part of your plea agreement.

21   Do you remember that?

22             THE DEFENDANT:  Yeah, I think so, yeah.

23             THE COURT:  I think?

24             THE DEFENDANT:  I think, yes, I saw it.

25             THE COURT:  All right.  Because of the amount of

                                                            32

1    restitution and the length of this sentence, the Court

2    finds the defendant does not have the financial resources

3    to pay the cost of incarceration, cost of supervision, or

4    any of the statutory fines.

5            However, there are $200 in special assessments.

6    Those must be paid.  The defendant waived his right to

7    appeal both his conviction and his sentence and his plea

8    agreement as long as the sentence was not higher than the

9    statutory maximum.

10           However, I still want to make sure Counsel you

11   talk with your client about whether he wants to file an

12   appeal.  And obviously if he does, he will need to file

13   it.  All right.  Is there anything further we need to

14   address?

15           MR. VAN GRACK:  No, Your Honor.

16           THE COURT:  Anything further from defense

17   counsel?

18           MS. MULLIN:  No, Your Honor.

19           THE COURT:  All right.  The defendant is

20   remanded.

21

22           **(Proceedings adjourned at 9:54 a.m.)**

23

24

25

                                                              33

1               CERTIFICATE OF REPORTER

2

3          I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Sentencing

7    in the case of the **UNITED STATES OF AMERICA versus ARDIT**

8    **FERIZI**, 1:16-CR-42, in said court on the 23rd day of

9    September, 2016.

10         I further certify that the foregoing 34 pages

11   constitute the official transcript of said proceedings, as

12   taken from my machine shorthand notes, my computer realtime

13   display, together with the backup tape recording of said

14   proceedings to the best of my ability.

15         In witness whereof, I have hereto subscribed my

16   name, this the May 11, 2017.

17

18

19

20

21   _____
                    Tonia M. Harris, RPR
22                  Official Court Reporter

23

24

25

                                                              34