IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Alexandria Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | 1:16-CR-42 (LMB) |
| ARDIT FERIZI, | ) | |
| | ) | |
| Defendant. | ) | |

**United States' Response in Opposition to
Defendant's Motion for Compassionate Release**

Ardit Ferizi has identified as a hacker since his teenage years. *See*, *e.g.*, Gov. Pos. on

Sentencing, Dkt. No. 54, p. 16; PSR ¶ 10. In April of 2015, he first put his computer skills to

work on behalf of the Islamic State in Syria and the Levant (ISIL), a designated foreign terrorist

organization whose *modus operandi* of violence and brutality needs no further introduction to

this Court. Ferizi began his efforts on behalf of the group by administering a website to host

ISIL videos and propaganda. However, his more specialized skills at compromising websites

proved of greater use to ISIL. In June 2015, he hacked the website of a U.S.-based Victim

Company and siphoned off the personally identifiable information (PII) of approximately

100,000 of its customers. He then culled that data to identify approximately 1,300 individuals

whose email addresses ended in .gov or .mil; *i.e.*, individuals who were United States

government employees or members of the United States military. On June 13, 2015, Ferizi sent

the PII of those 1,300 government personnel to ISIL with the understanding that ISIL would use

the information to create a "hitlist." ISIL's hacking division republished Ferizi's stolen

information via Twitter with the message:

> we are in your emails and computer systems, watching and recording your every
> move, we have your names and addresses, we are in your emails and social media
> accounts, we are extracting confidential data and passing on your personal

information to the soldiers of the khilafah, who soon with the permission of Allah will strike at your necks in your own lands!

*See* Gov. Pos. on Sent., Dkt. No. 54, PSR ¶¶ 9-13; 21.

Ferizi is serving a 240-month sentence for providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B, and accessing a computer without authorization and obtaining information, in violation of 18 U.S.C. § 1030(a)(2)(C). He is currently designated to USP Lewisburg, a high-security BOP facility in Lewisburg, Pennsylvania.[1] He has served 4 years and 10 months of his sentence, a little less than 25%, and with credit for time served and good behavior is projected to be eligible for release in December of 2032. Ferizi is a national of Kosovo with no legal status in the United States and a pending ICE detainer.

In light of the novel coronavirus and the COVID-19 pandemic, defendant seeks early termination of his prison term under the compassionate release provision in 18 U.S.C. § 3582(c)(1)(A)(i), and asks to be released to his parents' home in Kosovo, outside the reach and supervision of the U.S. Probation Office. The Court should deny his motion. Though his medical conditions, in light of the COVID-19 pandemic, create an "extraordinary and compelling" circumstance that might warrant release, there is no way for the Court to ensure the safety of the community were his motion to be granted. Using compassionate release in his case would fail to address a wide range of important practical and legal problems and would not satisfy the standards in § 3582(c)(1)(A).

---

[1] Though USP Lewisburg is a high-security facility, Ferizi is designated a medium-security prisoner by BOP. *See* Exhibit A, Ferizi's Inmate Profile.

On October 5, 2015, the government filed a criminal complaint in this district charging Ferizi with computer intrusion, aggravated identity theft, and providing material support to a designated terrorist organization. PSR ¶ 1. At the time of the events in this case and the filing of the complaint, Ferizi, a national of Kosovo, resided in Malaysia where he was attending college. PSR ¶¶ 2, 59. He was arrested there on October 12, 2015, and extradited to the United States on January 22, 2016. PSR ¶ 2. On February 16, 2016, a grand jury in this district returned a four-count indictment charging Ferizi with conspiring to provide and providing material support to ISIL, in violation of 18 U.S.C. ¶ 2339B; unauthorized computer access in violation of 18 U.S.C. § 1030(a)(2)(C), and aggravated identity theft in violation of 18 U.S.C. § 1028A. PSR ¶ 4. On June 15, 2016, the defendant pled guilty to Counts Two and Three of the Indictment, and Counts 1 and 4 were dismissed upon motion of the United States. PSR ¶ 5.

Ferizi is currently serving his 20-year sentence at USP Lewisburg. On June 25, 2020, Ferizi wrote to the BOP and made a formal request for compassionate release based on his COVID-19 risk factors of asthma and obesity. Dkt. No. 81-1, Exhibit H. On July 7, BOP denied his request. Exhibit B, Administrative Remedy Response. On August 7, 2020, Ferizi filed the instant motion.

As of September 4, 2020, BOP has reported that a number of inmates and staff at USP Lewisburg have recently tested positive for COVID-19. Out of a total of 1,306 inmates housed in Lewisburg, none are currently ill with COVID-19;[2] however, 85 have recently recovered, with no deaths. Eight staff members are also currently testing positive (though those staff members

---

[2] At the time the defendant filed his motion, there were a few dozen active cases in the prison; all have apparently since resolved without further spread of the virus.

have not returned to work while ill, per BOP protocols), and another has recovered. According to the BOP website, https://www.bop.gov/coronavirus/index.jsp, these statistics are updated daily at 11:00 a.m.

The government notes that none of the recent COVID-19 cases have been in Ferizi's housing unit, and USP Lewisburg has implemented specific procedures, beyond BOP's standard COVID-19 protocols, to address this outbreak. The institution went on lockdown as of July 30, 2020,[3] forbidding any commingling of staff or inmates between the various housing units.[4] The institution has conducted mass testing of the entire staff, and mass testing of entire inmate housing units where there has been a positive test result or known contact. In all housing units, including the ones, like Ferizi's, that remain unimpacted, they conduct daily temperature checks and evaluations of every inmate and resultant testing if appropriate—*i.e.*, if an inmate has a fever or otherwise displays symptoms. To date, they have tested over 200 staff and 440 inmates.[5] Because the layout of the institution is such that each housing unit is divided into one- or two-person cells, BOP reports that it has not been difficult to lock down and isolate any suspected

---

[3] The letter attached to the defendant's Supplemental Motion as Exhibit 2 (Dkt. 89-2) from the Pennsylvania Institutional Law Project regarding conditions in USP Lewisburg was written on July 1, 2020, and therefore did not take into account the specific procedures instituted by the facility at the end of July in response to the new cases.

[4] Because of his terrorism conviction, Ferizi was placed on a "two-hour watch" when he arrived at USP Lewisburg, which, as he explained in his motion, required him to check in with his unit officer every two hours during the day. Since the July 30 lockdown, two-hour watch has been suspended and, as of the drafting of this Response, he has no longer been required to conduct these check-ins.

[5] In his *pro se* Motion and in his subsequent Emergency Notices, the defendant repeatedly mentions that he has not personally been tested for COVID-19. USP Lewisburg has confirmed that this is indeed the case, but that it is not, as the defendant asserts, because of a lack of testing capability. Rather, Ferizi has not been tested because he has not had any known exposures to COVID-19, there are currently no cases among the inmates or staff in his housing unit, and neither he nor anyone else in his housing unit has displayed any symptoms of COVID-19.

cases, contrary to Ferizi's assertions about a lack of bedspace to contain outbreaks.


**ARGUMENT**

**I.    Ferizi's request for compassionate release to a foreign country should be evaluated against a practical and legal backdrop.**

The BOP is actively working on the critical problem of containing the spread of the coronavirus within prisons and has implemented a number of health-and-safety procedures governing all BOP facilities, including USP Lewisburg.  BOP has, among other steps, limited access to prisons, restricted prisoner movements within prisons, used screening and testing, sought to educate inmates and staff on preventing the spread of disease, provided masks and hand cleaners, separated ill inmates, and—in appropriate cases—released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.

Importantly, nothing in the CARES Act provides for the relief Ferizi now seeks—early termination of his custodial sentence and release to an ICE facility pending his removal to a foreign country.[6]  Instead, where the legislation concerns federal inmates, Congress focused on temporarily enlarging the discretion of the BOP to place inmates in home confinement.  *See* CARES Act, Section 12003(b)(2) (temporarily expanding BOP's existing authority under § 3624(c)(2) to designate prisoners to home confinement).  And since March 26, 2020, BOP has used that authority to place additional inmates on home confinement (*see* https://www.bop.gov/coronavirus/index.jsp), focusing on, among other factors, the vulnerability of the inmates, the

---

[6] It is unclear from the definition provided by the U.S.S.G. whether the release of a defendant to a foreign country would even qualify as "home detention," which is defined as "a program of confinement and supervision that restricts the defendant to his place of residence continuously . . . *enforced by appropriate means of surveillance by the probation office*." U.S.S.G. §5F1.2, Application Note 1 (emphasis added).

5

prisons most at risk, and the dangers posed by the inmates if released.

In addition to its efforts to increase the use of home confinement, BOP is continuing to accept and review requests for compassionate release under 18 U.S.C. § 3582(c)(1)(A). However, as of the writing of this responsive pleading, the government is unaware of instances in which courts have granted a foreign defendant's request to terminate his custodial sentence and order him released to ICE pending removal to his home country. Such a request raises a number of practical concerns, including whether ICE has the necessary resources to take custody of foreign defendants ahead of their expected release from BOP; whether ICE has the resources to ensure the health and safety of their staff and additional foreign defendants transferred to their custody; and, whether a defendant's home country is willing or able to repatriate citizens who have recently been incarcerated in the United States.[7] Indeed, without the appropriate resources and safety measures in place, release to ICE may increase the very health and safety risks that courts, the government, and defendants are seeking to mitigate.

In contrast to the vast logistical and practical uncertainties surrounding the defendant's proposal to be transferred to ICE custody and released to a foreign country, BOP has significantly altered operations within federal prisons to implement guidance issued by the Centers for Disease Control and Prevention (CDC) to manage the transmission of COVID-19. The current modified operations plan requires that all inmates in BOP institutions be secured in their assigned cells/quarters for a period of at least 14 days to stop any spread of the disease. Only limited group gatherings are permitted, with social distancing required to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.

---

[7] The government has made inquiries about ICE's readiness to take custody of federal inmates earlier than their expected release from BOP and has been unable to receive definitive guidance.

Further, BOP has limited the movement of inmates and detainees among its facilities. Though there are exceptions for medical treatment and similar exigencies, this step also limits transmission.

All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved. Every newly-admitted inmate is screened for COVID-19 risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, 2020, and, as of the date of this motion, have been suspended until further notice in order to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis

after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Ferizi's current request envisions a system where hundreds of federal district judges around the country try to use the tools of litigation to assess the capacity of immigration authorities take custody of foreign defendants on an accelerated schedule; ensure that appropriate resources are available to ensure inmates' and ICE staff's health and safety; and effect removals in a time when widespread travel bans are in place.[8]  Unfortunately, many of these facts are either quickly changing or not readily available—and making decisions without the necessary information could nullify the intended goal of any court order.

Under the present circumstances and, in particular, the circumstances surrounding a foreign national's request to be removed to his home country, courts should consider a wide range of important factors that have bearing on individual inmates' health, public health, and the risks associated with a foreign defendant's recidivism:

- *Avoiding recidivism.*  The conditions and place where a defendant will stay after release must limit the risk of recidivism—an important consideration given that federal inmates have a re-arrest rate that ranges from 30.2% for inmates with no criminal history points to 85.7% for inmates with 15 or more criminal history points.[9] This risk is heightened when a serious criminal offender seeks

---

[8] As of the drafting of this motion, Kosovo does not have a travel ban in place and the country's borders are open.  However, the U.S. Embassy in Kosovo warns on their website that "[i]t is possible that border restrictions could be re-imposed with little notice, and the frequent changes are causing confusion at airports and borders."  *See* U.S. Embassy in Kosovo, "COVID-19 Information," https://xk.usembassy.gov/coronavirus/.

[9] *See* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf#page=12.

release to a foreign country outside the reach of U.S. law enforcement and outside the reach of U.S. Probation Officers who can help offenders build a law-abiding life upon release.

- *Addressing the impact of releasing a foreign defendant to the custody of ICE.* A release order in a case involving a foreign national should include measures to ensure that an inmate who is presently incarcerated is not infected by the time the Court orders any release of an inmate into the custody of ICE. A release order should not only assess any additional risks that could be brought on by a defendant and any individuals presently working at, or housed in an ICE facility, including ICE officials, who may be required to supervise the defendant if he is transferred there. Courts should also consider how the accelerated release of a BOP inmate into ICE custody could impact the availability of health resources at ICE facilities, such as testing and protective equipment;

- *Evaluating how much of a difference a defendant's proposal would make to disease transmission inside defendant's prison.* Before a defendant receives the benefit of being released from prison, a court should determine the extent to which releasing a particular inmate makes a difference to disease transmission in a BOP facility, *see* https://www.bop.gov/coronavirus/; and

- *Assessing how much release would affect the particular inmate's health.* To justify cutting short an inmate's sentence, a defendant's release should make a sufficiently great improvement to the odds of maintaining an inmate's health, odds that may be difficult for a Court to determine where release plans involve relocating an inmate to an ICE facility, pending removal to a foreign country that is grappling with significant and widespread health challenges resulting from the pandemic.

This list is not exhaustive and, indeed, could include many additional considerations.

The point is that the factors cited above illustrate that, in his motion, Ferizi does not adequately grapple with the numerous practical impediments to ensuring his health and safety, the health and safety of others, and the feasibility of his removal request. The above points inform the legal framework discussed below.

**II.    The Statutory Framework for Evaluating Compassionate Release**

A § 3582(c)(1)(A) sentencing-reduction motion is not a flexible equitable remedy equivalent to clemency or parole.  Instead, Congress created a narrow statutory framework in which defendants, the BOP, and the Sentencing Commission all play a relevant part.  To that end, Congress has not itself delineated the universe of "extraordinary and compelling reasons" that could warrant compassionate release.  Instead, it has delegated that responsibility to the Sentencing Commission through several statutory provisions.  For instance, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section [] . . . 3582(c) of title 18."  Section 994(t) further advised that "[t]he Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."  28 U.S.C. § 994(t).  In its instructions to the Sentencing Commission, however, Congress made clear that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  *Id.*

Pursuant to Congress's instructions, the Sentencing Commission adopted a conforming policy statement that creates three requirements for compassionate release under § 3582(c)(1)(A).  U.S.S.G. § 1B1.13.  First, a court must conclude that "[e]xtraordinary and compelling reasons warrant the reduction."  *Id.* § 1B1.13(1)(A).[10]  Second, the court must conclude that "[t]he defendant is not a danger to the safety of any other person or to the

---

[10] The statement alternatively provides that absent extraordinary and compelling reasons, a court may find that a defendant who is at least 70 years old and has served at least 30 years on his conviction is eligible for a reduction. *See* U.S.S.G. § 1B.13(1)(B).

community, as provided in 18 U.S.C. § 3142(g)."  *Id.* § 1B1.13(2).  Third, the court must

conclude that "[t]he reduction is consistent with this policy statement."  *Id.* § 1B1.13(3).

The Sentencing Commission has also identified four categories of extraordinary and

compelling reasons:

(A)     Medical Condition of the Defendant;

(B)     Age of the Defendant;

(C)     Family Circumstances; and

(D)     Other Reasons.

U.S.S.G. § 1B1.13, cmt. n.1.  Commentary to § 1B1.13, in turn, clarifies that the open-ended

provision—labeled "Other Reasons"—only authorizes compassionate release if, "[a]s

determined by the Director of the Bureau of Prisons, there exists in the defendant's case an

extraordinary and compelling reason other than, or in combination with, the reasons described in

subdivisions (A) through (C)."  *Id.*

Consistent with subdivision (D), the Bureau of Prisons has identified several

nonexclusive factors for determining whether "other" extraordinary and compelling reasons

exist.  These include the defendant's criminal and personal history, the nature of his offense,

disciplinary infractions, length of sentence and amount of time served, current age and age at the

time of offense and sentencing, release plans, and "[w]hether release would minimize the

severity of the offense."  BOP Program Statement 5050.50 (Jan. 17, 2019), *available at*

https://www.bop.gov/policy/progstat/5050_050_EN.pdf.  The Program Statement explains that

the Bureau of Prisons authorizes compassionate release under § 3582(c)(1)(A) in "particularly

extraordinary or compelling circumstances which could not reasonably have been foreseen by

the court at the time of sentencing."  *Id.* at 1.

Ultimately, it is the defendant's burden to prove that he is entitled to compassionate

release under § 3582(c)(1)(A)(i).  *See White v. United States*, 378 F. Supp. 3d 784, 785 (W.D.

Mo. 2019); *see generally Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56–57 (2005) ("Absent

some reason to believe that Congress intended otherwise, . . . we will conclude that the burden of

persuasion lies where it usually falls, upon the party seeking relief.").

### A.    *Though Ferizi has made a showing of particularized risk that might justify compassionate release, he has failed to show how his proposed release plan presents a viable alternative.*

The government agrees that Ferizi has established "extraordinary and compelling reasons

to warrant . . . a [sentencing] reduction" under 3582(C)(1)(A)(i) because his medical conditions

increase his risk of suffering serious complications from COVID-19.  However, his proposal—to

be released into the custody of ICE, where he will be detained pending an uncertain removal to

Kosovo, a country with its own serious ongoing COVID-19 outbreak—does not appear to be a

practical or viable alternative to the resources available to him at the BOP facility where he is

currently housed.[11]

Courts have properly concluded that a risk of being infected by the coronavirus fails by

itself to justify compassionate release.  "[I]n the context of the COVID-19 outbreak, courts have

---

[11] The government notes, as did the defendant in his Supplemental Memorandum, that the exhaustion requirement of § 3582(c)(1)(A) does not appear to be at issue here.  Section 3582(c)(1)(A) provides that a defendant cannot obtain relief from this Court until BOP is given 30 days to evaluate the defendant's motion for compassionate release based on the threat of COVID-19.  The defendant submitted his administrative request for compassionate release to BOP and BOP denied his request, fulfilling the exhaustion requirement.

BOP's denial statement does not cite a reason for Ferizi's ineligibility.  *See* Exhibit B, Administrative Remedy Response.  However, BOP's Memorandum containing guidance for releasing prisoners to home confinement (Exhibit C) suggests that Ferizi would have been ineligible for a number of reasons, including his conviction for a terrorism crime and his ICE detainer.  BOP's guidance also prioritizes prisoners designated low or minimum security (Ferizi is designated medium security) and inmates who have served 50% or more of their sentence or have less than 18 months remaining (Ferizi has served only 25% of his sentence and has at least 12 years remaining).  *See* Exhibit D, Sentence Computation Data.

found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." *United States v. White*, — F. Supp. 3d —, No. 2:07CR150, 2020 WL 1906845, at *1 (E.D. Va. Apr. 17, 2020) (quoting *United States v. Feiling*, No. 3:19CR112, 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020)).

It is evident that Ferizi has shown a particularized risk of contracting, or experiencing adverse consequences from, COVID-19. Ferizi's BOP medical file shows his height and weight as consistent with a body mass index, or BMI, greater than 30, which the CDC lists as a condition that increases the risk of severe illness from COVID-19. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. Ferizi's medical record likewise shows that he suffers from asthma, though it appears that it is well-controlled (*i.e.*, not the moderate to severe asthma identified by the CDC as a condition that "might" cause increased risk of severe illness from COVID-19, *id.*). As noted in his Supplemental Memorandum, the medications he takes to control his asthma act as an immunosuppressant that, according to the CDC, "might" increase his risk as well. His motion also describes a number of other medical conditions, such as mental health issues and recurrent stomach pain, though the CDC does not recognize those conditions as ones that increase the risk of contracting or suffering adverse consequences from COVID-19. Nevertheless, his obesity on its own plainly increases his risk of severe illness, so the Court need not reach the issue of any of the other conditions. It is also evident that there is an outbreak of COVID-19 at USP Lewisburg, though, as described above, the defendant's own housing unit remains unaffected and the facility has taken radical measures to control the spread of the virus.

Regardless of Ferizi's particularized risk, however, the Court should deny the relief Ferizi

seeks because he has failed to demonstrate that his proposed release plan presents a viable alternative to BOP custody. Courts in this district have evaluated whether the release plan proposed by defendants would introduce new risks to themselves or others. *See, e.g., Feiling*, 2020 WL 1821457, at *8 ("Defendant fails to establish how his release on home confinement presents a viable alternative sentence. Indeed, Defendant's release on home confinement presents its own risks to Defendant's health, the health of his family and public safety.").

Ferizi has failed to establish that release from BOP—which has adopted a thorough set of healthcare and screening procedures to manage and mitigate the transmission of COVID-19—to the custody of ICE is a viable alternative. Based on the government's current information, it is unclear that ICE has the resources to take custody of BOP inmates earlier than their expected release date. It is also unclear that Ferizi's home country of Kosovo is in a position to receive him given the fluid state of COVID-related travel restrictions. *See* U.S. Dept. of State August 6, 2020, Travel Advisory, [https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Kosovo.html](https://travel.state.gov/content/travel/en/international-travel/International-Travel-Country-Information-Pages/Kosovo.html) ("Travelers to Kosovo may experience border closures, airport closures, travel prohibitions, stay at home orders, business closures, and other emergency conditions within Kosovo due to COVID-19.")

Even if Kosovo were able to receive Ferizi, it is unclear that his chances of contracting COVID-19 would be any less, or his ability to receive effective medical care any greater, were he to be returned to Kosovo. The country is currently under a Level 4 "Do Not Travel" Alert (the highest possible alert level) from the U.S. Department of State due to COVID-19. *Id.* The CDC has likewise designated Kosovo a "Level 3"/"Avoid Nonessential Travel" country (again the highest possible alert level), noting that "[t]ravelers at increased risk for severe illness from COVID-19"—as the parties agree Ferizi is—"should consider postponing all travel, including

essential travel, to Kosovo" due to the spread of COVID-19 and the limited availability of medical resources. *See* CDC Travelers' Health Warning—COVID-19 in Kosovo, https://wwwnc.cdc.gov/travel/notices/warning/coronavirus-kosovo. The U.S. Embassy in Kosovo provides additional information on its own website, recommending against travel and noting, "The health situation is deteriorating, and public institutions are struggling to keep up with demand." U.S. Embassy in Kosovo, "COVID-19 Information," https://xk.usembassy.gov/coronavirus/. The Embassy describes in their latest, August 4, 2020, Travel Alert, that "[d]eteriorating capacity to deal with Covid-19 patients, shortage of supplies, and unenforced safety measures result in one of the world's highest per capita rates for new Covid-19 infections." *Id.* Kosovo, a country of only 1.8 million people, has logged between 100 and 200 new coronavirus cases each day throughout the month of August, with over 13,200 confirmed cases nationwide. *See* World Health Organization COVID-19 Dashboard, Kosovo, https://covid19.who.int/region/euro/country/xk. Ferizi is unable to demonstrate that a return to Kosovo would meaningfully decrease his risk of contracting COVID-19, or that he would have access to better medical case there were he to become ill.

> **B.** **Other 3553(A) factors counsel against granting the requested relief, and there is no way to ensure the safety of the community should the defendant be released without supervision.**

Most critically, however, the seriousness of Ferizi's crimes and the risk of his recidivism in a country outside the reach of U.S. law enforcement provide the strongest argument against early termination of his sentence. Compassionate release is only appropriate where the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2). That statute instructs the court to consider several factors, including whether the underlying offenses constitute crimes of violence, whether the

offenses involved firearms, and the defendant's criminal record.  At the same time, § 3582(c)(1)(A) expressly directs the Court to consider the statutory sentencing factors under 18 U.S.C. § 3553(a) in adjudicating a compassionate release motion.  Here, these factors counsel strongly against granting a reduction in the defendant's sentence.

This was an extremely serious offense, as the Court acknowledged at sentencing, and as the 20-year sentence itself illustrates.  Ferizi was convicted of a computer intrusion directly targeting U.S. government and military personnel on behalf of ISIL, a foreign terrorist organization that, at the time of Ferizi's crimes, called for attacks against Americans wherever they could be found.  Gov't Pos. on Sent., Dkt. 54, p. 2.  1,300 innocent victims, all public servants, lived in fear of becoming the target of an ISIL or ISIL-inspired attack in their own homes as a result of Ferizi's crime.  The defendant's actions were deliberate and took place over a considerable period of time.  Though at sentencing he disclaimed any belief in ISIL ideology, the fact remains that at the time of his offenses, he was well aware of ISIL's violent activity, and was acting in explicit support of it.  There can be no doubt that he fully understood, and intended, that ISIL would use the information he provided to create a "hitlist"; Ferizi discussed this explicitly with Tariq Hamayun and Junaid Hussain, his contacts in the Islamic State Hacking Division.  Hussain wrote to Ferizi, "we will make like a message, inshAllah [God willing]" / "like u know the hitlist I made" / "with addresses" / "we will make message to kuffar[12] and release the .mil and .gov."  Ferizi responded, "ok brother <smiley face>."  Hussain wrote, "Akhi [brother] this will hit them hard," and Ferizi replied, "yes brother inshAllah <smiley face>."  Govt Pos. on Sent., Dkt. 54, Attachment C (Ferizi's communications with Junaid Hussain), reattached here as Exhibit E.

---

[12] *Kuffar* is a derogatory term used to refer to non-Muslims.

Ferizi's crime may not have been a traditional crime of violence: he himself took no violent action against the 1,300 victims. But he exposed each and every one of those victims to the terror of violence against themselves or their families, violence that might strike unexpectedly, at any time. He did so while telling others who challenged his support for ISIL that ISIL was justified in releasing similar "hitlists" because the U.S. military "killed peoples [sic] in Iraq and Syria." He now asks that he be released, less than 5 years into his 20-year sentence, to his home in a foreign country where he will be entirely outside the jurisdiction of this Court and the supervision of the U.S. Probation Office, free to resume his online activities unmonitored by U.S. law enforcement or the Court. The Court should conclude that Ferizi's risk of recidivism—and the grave danger to the community if he does so—is too high to warrant such an early termination of his custodial sentence. As one court has held, the need to monitor electronic devices for defendants undermines the case for compassionate release. *Cf. United States v. Sears*, No. 19-CR-21 (KBJ), 2020 WL 3250717, at *3 (D.D.C. June 16, 2020) (the need to electronically monitor a child-pornography defendant would "pose[] a risk to the community, because the need for intensive monitoring in the age of COVID-19 would likely result in heightened safety risks ... to the probation officers who would be tasked with monitoring his behavior…."). That logic applies with even more force where, as here, the defendant proposes to be released to a foreign jurisdiction.

Likewise, the defendant has only served approximately one quarter of his sentence. Releasing him now would therefore be incompatible with the statutory sentencing goals of promoting respect for the law and achieving just punishment. That, too, factors against compassionate release. *See United States v. Pawlowski*, — F. App'x —, 2020 WL 3483740, at *2 (3d Cir. June 26, 2020) (affirming denial of relief where release "would effectively reduce

Pawlowski's sentence from 15 years to less than two years' imprisonment"); *United States v. Kincaid*, 802 F. App'x 187, 188 (6th Cir. 2020) ("Despite Kincaid's assertion that the amount of time served is not a proper basis for denying compassionate release, the need to provide just punishment, the need to reflect the seriousness of the offense, and the need to promote respect for the law permit the court to consider the amount of time served in determining whether a sentence modification is appropriate."); *Porter-Eley, v. United States*, No. 4:16-CR-89 (RAJ), 2020 WL 3803030, at *3 (E.D. Va. July 6, 2020) ("Petitioner has served a small percentage of her term of incarceration implicating the need for deterrence and a sentence that reflects the seriousness of her offense."); *United States v. Bogdanoff*, — F. Supp. 3d —, 2020 WL 2307315, at *6 (E.D. Pa. May 8, 2020) (denying compassionate release where the inmate had served only seven years of an 18-year sentence, and noting that the case was "much different than others where defendants [sought compassionate release] at the end of their sentence"); *United States v. Moskop*, No. 11-CR-30077 (SMY), 2020 WL 1862636, at *1–2 (S.D. Ill. Apr. 14, 2020) (denying compassionate release where the inmate had served less than 10 years of a 20-year sentence and explaining that the "sentencing objectives of specific deterrence and protecting the public [would] not [be] fully served by less than 10 years of incarceration").

C.     ***The defendant's arguments in favor of compassionate release are not persuasive.***

The defendant in his original *pro se* motion makes essentially two claims about why he would not pose a danger to the community or a risk of recidivism: first, that this Court misunderstood his criminal history at sentencing, and second, that his PATTERN score indicates a "low" recidivism risk.[13] The defendant's *pro se* motion first argues that the Court

---

[13] In Exhibit 5 of the defendant's Supplemental Memorandum, he also includes a letter from his mother, Dijana Ferizi, in which she promises, if he is released to her home, to "monitor him

misunderstood several untranslated or incompletely translated documents from Kosovo regarding his prior criminal hacking activity. But those documents do not appear to have been a driving factor in the Court's understanding of the 3553(a) factors at sentencing, nor did they affect his Criminal History Category under the U.S. Sentencing Guidelines, which was controlled by U.S.S.G. § 3A1.4(b), the terrorism sentencing adjustment that sets the offender's Criminal History Category at VI for purposes of the Guidelines calculation. Ferizi points to several statements made by the Court at sentencing regarding the fact that he had engaged in hacking activity from his early teenage years—but the basis for the Court's understanding of those facts does not appear to primarily have been the untranslated documents, but rather the undisputed information in the PSR that in 2013 Ferizi claimed to be a hacker known as Th3Dir3ctorY, who led a hacker group called Kosova Hacker's Security that had claimed responsibility for having hacked more than 20,000 websites. PSR ¶ 10. Regardless of how the documents are translated, they should not control the Court's assessment of Ferizi's dangerousness, his risk of recidivism, or the proper application of the 3553(a) factors.

The defendant also raises the issue of his "low risk" PATTERN score.[14] PATTERN ("Prisoner Assessment Tool Targeting Estimated Risk and Need") is a predictive algorithm used by BOP to assess a prisoner's recidivism risk and programming needs, as required by 18 U.S.C.

---

[14] and make sure he does not use the computer." With the utmost respect to Mrs. Ferizi, whom the government does not doubt is sincere, this is not nearly sufficient assurance to ensure the safety of the community. Should the defendant be returned to Kosovo, outside the reach of the Court, there would be nothing whatsoever to prevent him from disregarding his parents' limitations on his computer use, or simply leaving his parents' home altogether. No matter her sincerity, Mrs. Ferizi herself has no way to ensure that the defendant—who is a legal adult—complies with her restrictions.

[14] An inmate's PATTERN score is separate from their designation as a minimum, low, medium, or high security prisoner: Ferizi has a "low risk" PATTERN score, is a medium security prisoner, and resides in a high security facility. *See* Exhibit A, Ferizi's Inmate Profile.

§ 3631 *et seq.* *See* Exhibit F, *The First Step Act of 2018: Risk and Needs Assessment System –*
*UPDATE*, January 2020, p. 1. Based on the algorithm, Ferizi is "low risk," the second of four

risk categories (minimum, low, medium, and high). BOP has been using PATTERN scores in

making their determinations about inmates' eligibility for compassionate release during the

COVID crisis, prioritizing inmates with a minimum score, and generally barring inmates with a

medium or high score from release to home confinement. PATTERN scores, however, are not

the sole or deterministic factor in BOP's compassionate release decisions; a minimum or low risk

score is a necessary but not sufficient condition for release.

PATTERN scores are calculated using a number of dynamic and static factors. The static

factors are the inmate's age, criminal history score, whether the offense of conviction was

violent, and whether the inmate is a sex offender. The dynamic factors include the inmate's

history of infractions in the prison, both violent and nonviolent; the number of programs,

particularly work programs, completed by the inmate; the inmate's successful completion of

drug treatment; compliance with the inmate's financial responsibilities; the inmate's history of

violence and escapes; and the inmate's educational history. *Id*. p. 10-11; *see also* Appendix II on

p. 37-39. Indeed, Ferizi has largely been successful during his sentence so far. He has

completed a substantial number of programs, including drug treatment, though he has also

committed two disciplinary infractions (*see* Exhibit G, Ferizi's Inmate Disciplinary Record). But

PATTERN scores cannot and do not take into account other critical factors that the Court should

weigh in assessing Ferizi's risk of recidivism—the seriousness of the offense of conviction, the

ideology of a defendant who provided material support to a brutal terrorist organization, and the

ability, or lack thereof, of the Court to monitor the defendant's activity after his release.

Ultimately, neither of the defendant's claims about his risk of recidivism address what, at

least to the government, is the most critical concern:  the simple fact that the defendant was convicted of a federal crime of terrorism explicitly targeting U.S. personnel, and were he to be released to Kosovo, he would be entirely outside the reach of the government should he choose to reoffend.  There is no way for the Court to ensure the safety of the public were Ferizi to be granted compassionate release.  For all of the reasons articulated above, but this one most of all, the defendant's motion should be denied.

Finally, if this Court were to disagree with the government's position above, any order that this Court issues that grants a defendant compassionate release should require the defendant to undergo a 14-day quarantine that BOP controls before any release into the custody of any other government agency, including ICE.

## Conclusion

For the foregoing reasons, the Court should deny the defendant's motion for compassionate release.

Respectfully submitted,

G. Zachary Terwilliger
United States Attorney

_____/s/_____

Danya E. Atiyeh
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:     (703) 299-3700
Fax:        (703) 299-3980
Email:     danya.atiyeh@usdoj.gov

**Certificate of Service**

I certify that on September 4, 2020, I filed electronically the foregoing with the Clerk of

Court using the CM/ECF system, which will serve all counsel of record.


By: _____/s/_____

Danya E. Atiyeh
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314
Office:  (703) 299-3700
Fax:      (703) 299-3980
Email:   danya.atiyeh@usdoj.gov