UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 1:16-CR-42 |
| | ) | |
| ARDIT FERIZI, | ) | |
|         Defendant. | ) | |
| | ) | |

**REPLY IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

The government agrees that Ardit Ferizi is undeniably at increased risk of severe illness from the novel coronavirus, which is tearing through this country and the nation's federal and state prisons and local jails.[1] Indeed, in its response to his Motion for Compassionate Release, the government concedes that Mr. Ferizi "has established 'extraordinary and compelling reasons to warrant a [sentencing] reduction' under 3582(c)(1)(A)(i) because his medical conditions increase his risk of suffering serious complications from COVID-19." Dkt. 95 (Gov't Resp.) at 12. The government also acknowledges that Mr. Ferizi "has largely been successful during his sentence so far" and that he has "completed a substantial number of programs, including drug treatment. . . " *Id*. at 20. Furthermore, the government agrees that Mr. Ferizi's PATTERN score—which the government describes as a "predictive algorithm used by BOP to assess a prisoner's recidivism risk and programming

---

[1] Pamunkey Regional Jail, which houses state prisoners as well as federal pretrial detainees in the Eastern District of Virginia, is currently experiencing an outbreak of Covid-19.

1

needs"—is "low risk." *Id*. at 19. In sum, the government acknowledges both that Mr. Ferizi has met the statutory standard set forth in § 3582(c)(1)(A)(i) – extraordinary and compelling reasons that warrant a sentence reduction – and that Mr. Ferizi presents little risk to the public and has demonstrated a commitment to rehabilitation while incarcerated.

Nonetheless, the government opposes Mr. Ferizi's motion principally on practical grounds arising from his foreign nationality, the inability of the U.S. government to monitor his conduct if released to his country, and the lack of a "viable alternative to BOP custody." *Id*. at 14, 21. In essence, the government proposes that this Court abdicate its statutorily defined role and defer to the BOP—precisely the opposite of what Congress intended when it enacted the First Step Act almost two years ago. The government also speculates, without basis, that it will be safer for Mr. Ferizi to remain in prison than to return his family home in Kosovo.

This Court should reject the government's invitation and discount the government's opposition to Mr. Ferizi's motion for at least the following reasons: First, as the government acknowledges, Mr. Ferizi is at high risk for developing serious illness or dying should he contract COVID-19 because he falls into at least two CDC-defined high risk categories for COVID-19. Second, far from subsiding, the coronavirus pandemic is mushrooming, with confirmed cases nationwide passing 6.3 million, with inmates disproportionately impacted by BOP's failure to manage the crisis in its facilities, as it has tested only a fraction of those in its custody. Third, this Court should roundly reject the government's attempt to upend the

2

compassionate release process Congress laid out in the First Step Act of 2018. Fourth, Mr. Ferizi, who was a teenager when he committed this offense, has been amply punished and he has demonstrated that he has matured and is ready to be safely return home to his family in Kosovo. Fifth, releasing Mr. Ferizi actually favors public safety and would serve the interests of justice.

### 1. *Mr. Ferizi is at high risk for serious illness—even death—should he contract COVID-19.*

With a BMI of 30, Mr. Ferizi is clinically obese. This condition places him at risk of serious illness should he contract COVID-19, regardless of age.[2] Indeed reports show that "[E]ight months into the pandemic, obesity has turned out to be one of the clearest predictors of a difficult battle against covid-19, for reasons that may vary from person to person."[3] Mr. Ferizi also has asthma for which he takes an immunosuppressant, which also renders him high risk according to the CDC. Accordingly, it is no surprise that the government has conceded that Mr. Ferizi has established "extraordinary and compelling circumstances" for purposes of 3582(C)(1)(A)(i). *See* Dkt. 95 (Gov't Resp.). Likewise, district judges, including in this district have granted compassionate release for defendants suffering from

---

[2] Center for Disease Control, *Coronavirus Disease 2019 (COVID-19): People with Certain Medical Conditions* (updated Aug. 14, 2020), available at <https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html>.

[3] *One man's battle show why obesity and COVID-19 are a toxic mix*, Washington Post, September 4, 2020, available at https://www.washingtonpost.com/health/coronavirus-obesity-risks/2020/09/04/0f370980-e22f-11ea-b69b-64f7b0477ed4_story.html; article attached as Reply Exh. 2.

obesity and asthma. *See e.g., United States v. Vaughn*, No. 3:18CR22-07-REP (E.D. Va, July 27, 2020) (Dkt. 308) (granting compassionate release for obese defendant); *see also United States v. Camp*, No. 3:06-cr-12-RLY-WGH (S.D. Ind. Aug. 10, 2020) (Dkt. 16 at 5) (granting compassionate release and noting "the United States concedes that Mr. Camp has presented extraordinary and compelling circumstances supporting release in that he is obese."); *United States v. Latney*, 1:19-cr-202-AJT, doc. 36 at 5 (granting compassionate release for 25-year old asthma sufferer noting that Mr. Latney uses an albuterol inhaler as needed and a nebulizer twice a week).

While not addressed in the government's response because by its own admission "his obesity on its own plainly increases his risk of severe illness," Gov't. Resp. at 13, Mr. Ferizi also suffers from mental health disorders, including PTSD, which render his time in prison more punishing than it otherwise would be. Additionally, there is evidence that mental disorders exacerbate a person's vulnerability to COVID-19. *See* Dkt. 94 (Supplement to *pro se* Motion for Compassionate Release) at 16.

In sum, Mr. Ferizi has shown that he faces specific increased risks of severe illness and death due to the coronavirus and these constitute extraordinary and compelling reasons for his compassionate release.

### *2. The coronavirus pandemic in this country remains a present danger—even more so within the BOP.*

The Court is no doubt of aware of the data that shows that the COVID-19 coronavirus is continuing to spread around the country and in the BOP. Coronavirus deaths have climbed to more than 189,000 deaths in the United States and the CDC

4

Director has predicted another surge in the fall and winter.[4] In short, this crisis is far from over and the BOP has proven itself thoroughly incapable of protecting those within its care.

The best proof that BOP cannot control the spread of the coronavirus is that BOP has not controlled the spread of the coronavirus—now more than six months into this pandemic. Instead, judges across the country have described prisons as "powder kegs for infection" that allow "the COVID-19 virus to spread with uncommon and frightening speed." *United States v. Rountree*, 1:12-CR-0308-LEK, 2020 WL 2610923, at *5 (N.D.N.Y. May 18, 2020); *see also United States v. Young*, NO. 4:16-40036-TSH, 2020 WL 2514673, at *2 (D. Mass. May 15, 2020) ("[T]he virus can appear suddenly and spread quickly in the prison population"). And, despite efforts at containment, BOP is getting no better at protecting inmates as the months pass.[5] FCI Seagoville stands as a stark example of how quickly the virus spreads in prison: on June 23rd, the prison had just two confirmed COVID-19 cases, as shown by a data-tracking project at the University of Iowa College of Law.[6] A week later there were

---

[4] *CDC director predicts this fall and winter will be 'one of the most difficult times we've experienced in American public health*, Business Insider, July 14, 2020 available at <https://www.businessinsider.com/cdc-director-robert-redfield-deadly-coronavirus-surge-fall-winter-2020-7>.

[5] *See* The Marshall Project, *A State-by-State Look at Coronavirus in Prisons* (updated Aug. 28, 2020, 3:15 PM), available at <https://www.themarshallproject.org/2020/05/01/a-state-by-state-look-at-coronavirus-in-prisons> (finding nearly 110,000 cases among prisoners and increases week-over-week from the week of June 14 to the week of August 11).

[6] Univ. of Iowa College of Law, *Compassionate Release Work, Graphing Active COVID Cases in the BOP* (Aug. 13, 2020) (available at: https://bit.ly/3gkiPde).

89 cases.[7] Two weeks later, 418 cases.[8] Three weeks later, 893 cases.[9] By August 13th, FCI Seagoville had 1379 inmates infected.[10] The facility houses only 1,640 inmates, meaning an infection rate of **84%**. FCI Seagoville is not alone. In June, FCI Lompoc posted an infection rate of **86%**.[11] FCI Elkton peaked on July 22nd with an infection rate of **59%**.[12] FCI Butner Low: **66%**.[13] These are the confirmed numbers, but medical experts suspect, due to insufficient testing and a lack of transparency, the figures in prisons are actually much higher.[14]

These staggering numbers are confirmed more widely by the American Medical Association (AMA). In July, the AMA confirmed what defense attorneys have been telling courts across the country for months: "COVID-19 case rates have been substantially higher and escalating much more rapidly in prisons than in the U.S.

---

[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Compassionate Release Work.*
[11] *Id.* (showing 896 cases on June 21); *see also* Bur. of Prisons, *Population Statistics*, available at <https://www.bop.gov/mobile/about/population_statistics.jsp> (stating FCI Lompoc's population is 1,035 inmates).
[12] *Compassionate Release Work.* (showing 1,070 infections); *see also Population Statistics* (listing 1,813 inmates).
[13] *Compassionate Release Work.* (showing 723 infections); *see also Population Statistics* (listing 1,090 inmates).
[14] Medical News Today, *COVID-19 cases 5 times higher in prisons than general population*, (July 15, 2020), available at <https://www.medicalnewstoday.com/articles/covid-19-cases-5-times-higher-in-prisons-than-general-population> ("While these numbers are striking, we actually think the disparities within prisons is much greater . . . [because] [s]ome prisons are not reporting any cases; others are not even testing inmates.").

population."¹⁵ The AMA concluded there is no dispute—it is vastly more dangerous in prison than in the population at large.¹⁶

Against this backdrop, the government concedes that there has been an "outbreak" at Mr. Ferizi's facility but asserts that the virus has not yet reached his particular housing unit. *See* Gov't Resp. at 13. (conceding that "there is an outbreak at USP Lewisburg" but noting that noting that Mr. Ferizi's unit "remains unaffected."). This is of cold comfort to Mr. Ferizi, who knows that BOP can move him from one unit to another unit and indeed, from one prison to another prison, without a moment's notice. Moreover, the government cannot truly know if the virus has infiltrated Mr. Ferizi's unit where it concedes that the Lewisburg staff are only testing inmates who show symptoms, *id.* at 4, despite it now being common knowledge that the virus can be transmitted by people who are totally asymptomatic.¹⁷

Not only is the infection rate much higher within prisons, as one judge in this district noted, there is "growing evidence of BOP's chronic mismanagement of its vulnerable population during the COVID-19 pandemic." *Woodard v. United States*,

---

¹⁵ B. Saloner, Ph.D., et al., *Covid-19 Cases and Deaths in Federal & State Prisons*, J. Am. Med. Assoc. (July 8, 2020), available at <https://bit.ly/3jD9PBZ>.
¹⁶ *Id.*
¹⁷ *See, e.g*, Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020), *available at* https://www.nytimes.com 2020/03/31/health/coronavirus-asymptomatic-transmission.html; *see also* CDC, "How Coronavirus Spreads" webpage, *available at* https://www. cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads. html?CDC_AA_refVal=https%3A%2F %2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html

No. 2:12-CR-105-RAJ, 2020 WL 3528413, at *3 (E.D. Va. June 26, 2020) (internal citation omitted). Accordingly, it defies the reality of the pandemic to conclude that Mr. Ferizi is not at risk. BOP inmates have died of the coronavirus in facilities where only a few cases were confirmed.[18] Young, apparently healthy BOP inmates have died of the virus.[19] The threat to Mr. Ferizi remains clear and pressing.

### 3. *Congress expressly intended for Mr. Ferizi to seek this Court's intervention.*

The government suggests this Court should deny Mr. Ferizi relief because it is too burdensome for vulnerable inmates like Mr. Ferizi to seek the intervention of the courts under the circumstances of this pandemic. *See* Gov't Resp. at 10 (suggesting the courts should defer to the "BOP's efforts"). Congress prescribed access to the courts as the remedy here and it did so because it was dissatisfied with the BOP's management of the compassionate release process. *See* U.S. DOJ OIG, *Federal Bureau of Prisons' Compassionate Release Program*, at 11 (2013) (surveying BOP handling of compassionate release program and concluding that "BOP does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."). Congress' intent was to "***Increas[e] the Use*** and Transparency of Compassionate Release" as it pointedly titled the section of the First Step Act amending § 3582(c)(1)(A), § 603(b). First Step

---

[18] For example, an inmate died of COVID-19 at Oakdale II FCI, which has reported only seven inmate cases and nine staff cases. *See* https://www.bop.gov/coronavirus/.

[19] *See* Bur. of Prisons, Press Release re: death of 37-year-old Mohamed Yusuf at Lompoc FCI on May 25, 2020 (May 29, 2020).

8

Act of 2018, Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018) (emphasis added). Thus, Congress expressly authorized inmates like Mr. Ferizi to seek redress from this Court and expressly instructed that this Court need not defer to the "BOP's efforts."[20] This Court should reject the government's invitation to upend Congressional intent by deferring to the BOP.

### 4. Mr. Ferizi can be released safely.

A teenager when he committed this offense, Mr. Ferizi has demonstrated that over the past five years, he has matured and that he has used his time in prison productively. The government does not dispute that Mr. Ferizi has availed himself of a variety of classes, has completed drug treatment, and has a "low risk" PATTERN score. Mr. Ferizi has more than amply demonstrated that he is ready to be released, a factor which favors his compassionate release. *See United States v. Crowell*, No. 16-107-JJM-LDA, 2020 WL 4734341 at *2 (D.R.I. Aug. 14, 2020) ("the Court concluded] that it [was] appropriate to release Mr. Crowell [because] the risk that [he] will reoffend has diminished . . . [and] '[d]uring this brief period, he has presented no management concerns.") (internal citation omitted); *see also United States v. Chapman*, No. 09-CR-0741, 2020 WL 2850984 at *2 (N.D. Ill. June 2, 2020) (reducing

---

[20] Though the government claims otherwise, courts actually are well-versed in making the kind of fact-based inquiry that is necessary to decide a motion for compassionate release like Mr. Ferizi's. Fact-based determinations about a particular defendant's circumstances are what sentencing courts do every day. *See* 18 U.S.C. §§ 3553(a) & 3582(c). It is worth repeating that Congress specifically assigned to the courts the task of conducting the compassionate release assessment when moved by an inmate whose plea to the BOP went unanswered or was denied. *See* First Step Act § 603(b); 18 U.S.C. § 3582(c)(1)(A).

9

Chapman's sentence to time served because "[h]is BOP adjustment reports indicate that '[he] interacts appropriately with staff and inmates [and] [h]e is not considered to be a management concern.'").

The government suggests that it is not safe for Mr. Ferizi to return home to his *own family* in Kosovo and that it would be safer for him to remain in federal prison. While, like the United States, Kosovo has cases of coronavirus, the country has a lower infection rate than the United States.[21] Moreover, the government's spurious speculation disregards the plain fact that BOP facilities are categorically less safe than residing in a single family home in the general population.

Instead of acknowledging the clear risks inherent to Mr. Ferizi remaining in prison, the government instead speculates that ICE *might* delay in returning Mr. Ferizi immediately and that Kosovo *might* implement a travel restriction. Gov't. Resp. at 14. Currently, there is no bar to Mr. Ferizi's return. These purported concerns are of no moment to the instant motion. If the Court grants Mr. Ferizi's motion, he will be returned to Kosovo in due course and reunited with his family who will welcome him home with open arms. Once at home, Mr. Ferizi can safely quarantine in his childhood bedroom, which Mrs. Ferizi has maintained for him with

---

[21] There have been 13,748 cases and 538 deaths in Kosovo, a country of about 1.85 million people, making the rate of COVID-19 cases approximately 739 per 100,000 people (compared to the United States' rate of 1,871 per 100,000 people). World Health Organization, Kosovo (Sep. 5, 2020, 10:33 AM CEST) https://covid19.who.int/region/euro/country/xk; Center for Disease Control, United States COVID-19 Cases and Deaths by State (Sep. 4, 2020 12:16 PM EST) https://covid.cdc.gov/covid-data-tracker/#cases.

the ardent hope that he will return home. *See* Exh. 1 to Reply (photo of Mr. Ferizi's room in his family home in Kosovo).

Furthermore, the government requests that if the Court grants release, it should order Mr. Ferizi to quarantine in BOP before release. So, on the one hand, the government suggests that Mr. Ferizi will be safer in prison than at home, but in the same breath suggests that he must quarantine in prison before he is returned to Kosovo. The only reason to request a BOP-controlled quarantine is that, despite its specious suggestion that return to his family home Kosovo is less safe than prison, the government knows what is by now is common knowledge: congregate settings like prison are not safe places in which to protect against coronavirus. Indeed, "multiple courts have concluded that most of the recommended measures to prevent infection are impossible or not feasible in prison." *United States v. Davis*, No. 3:13-cr-00045-RLY-CMM (Dkt. 86 at 6) (S.D. Ind. August 7, 2020); *see also United States v. Zukerman*, No. 16-cr-194-AT, 2020 WL 1659880, at *5 (S.D.N.Y. Apr. 3, 2020) ("Given that inmates at Otisville live in close quarters, social distancing is impracticable if not impossible, making it difficult for Zukerman to protect himself from the spread of this dangerous and highly contagious virus."); *United States v. Pabon*, No. 17-165-1, 2020 WL 2112265, at *5 (E.D. Pa. May 4, 2020) ("Prisons are ill-equipped to prevent the spread of COVID-19").

Finally, the government argues that the Court should deny Mr. Ferizi's motion because he will not be subject to supervision by U.S. Probation. For a number of reasons, the Court should reject the government's argument. First, Mr. Ferizi has

provided every indication during his period of incarceration that he has matured and is no longer the impulsive and impressionable teenager that committed the underlying offense. Second, his prosecution itself – in which Mr. Ferizi was apprehended outside of the United States and brought here to face federal criminal charges – makes clear that Mr. Ferizi will not be "outside the reach of the government" if he were to be returned to Kosovo. Third, the government's argument proves too much, because it implies that Mr. Ferizi should never be released from U.S. custody. This Court's sentence, however, necessarily envisions a day when Mr. Ferizi will be returned to his home country. We simply believe that now is the time for that to occur, given the significant danger from COVID-19 that the government admits Mr. Ferizi faces while in BOP custody. Finally, the government is well aware that Kosovo authorities are fully equipped to supervise Mr. Ferizi. Indeed, members of Kosovo's law enforcement flew to the United States to debrief Mr. Ferizi following his arrest for this offense. There is no question that—to the extent there is any concern—the United States government can request that Kosovo's authorities supervise Mr. Ferizi when he is returned to Kosovo.[22]

### 5. *Releasing Mr. Ferizi would foster public safety and serve the interests of justice.*

---

[22] Moreover, Kosovo and the U.S. have an extradition treaty to "agree to extradite to each other persons sought by authorities in the Requesting State for prosecution or for imposition of a sentence for an extraditable offense." Extradition Treaty, Kos.-U.S., art. 1., Mar. 29, 2016, T.I.A.S. No. 19-613; https://www.state.gov/wp-content/uploads/2019/06/19-613-Kosovo-Extradition.pdf.

The rampant spread of coronavirus through the nation's prison system puts everyone at risk, not just inmates and staff. Staff and attorneys who enter facilities return home at the end of the day to be near their loved ones. They and their families shop, eat, exercise, attend churches and otherwise interact with their communities. The highly virulent coronavirus can be transmitted during any of those interactions, from within the prison to those outside and vice versa.[23] *See, e.g.*, *Woodard*, 2020 WL 3528413, at *3 (E.D. Va. June 26, 2020) ("the Court finds that the risks that would be presented by Petitioner's continued incarceration outweigh the risks of releasing him to home confinement") (citing *United States v. Davis*, No.: ELH 20-09, 2020 WL 1529158, at *4 (D. Md. Mar. 30, 2020) ("'This pandemic is shedding a bright light on the extent of the connection between all members of society: jails, prisons and other detention facilities are not separate, but are fully integrated with our community.'" (quoting Mar. 25, 2020 Ltr. from Johns Hopkins Faculty to (Maryland) Gov. Hogan)). New information suggesting that the coronavirus may be airborne has even more alarming implications for the disease's spread through institutions like a prison, and, therefore for the communities that surround them.[24]

---

[23] For example, one study found that movement in and out of the Cook County (Illinois) Jail was associated with 15.9 percent of COVID-19 cases in Chicago and 15.7 percent of COVID-19 cases in Illinois. *See* Michael Ollove, *How COVID-19 in Jails and Prisons Threatens Nearby Communities*, PewTrusts (July 1, 2020), available at <https://rb.gy/ilizfn>.

[24] On July 7, 2020, the World Health Organization confirmed that there is emerging evidence that the coronavirus can be transmitted through droplets that float in the air. *See* Erdman, WHO Confirms There's 'Emerging Evidence' of Airborne Transmission of Coronavirus, CNN (July 8, 2020) (WHO confirmation came after open letter from 239 scientists seeking more recognition of possibility that the novel coronavirus can linger in the air for some time). Further, a study published in JAMA

This community risk must be assessed in light of the other factors in this case. Mr. Ferizi was just a teenager when he hacked into a retail database. And while he shared the information, he did not post the threatening post. He did not directly threaten or injury any of the victims. Instead, in a spectacular lack of judgment indicative of his juvenile mindset, he provided the information he obtained to a member of ISIL. He understands that by doing this, he set in motion a series of events that caused the victims psychological harm. He has demonstrated his remorse for his conduct in his private conversations with his family and by cooperating as best he could with both U.S. and Kosovar law enforcement.

Having been tortured in a Malaysian prison and now imprisoned thousands of miles from home during a cataclysmic global health crisis, Mr. Ferizi has been justly punished for his crime. For these reasons, additional imprisonment is not needed to achieve deterrence. Even the Justice Department concedes that further deterrence is not achieved by requiring Mr. Ferizi to serve additional time under the current threat to his health and well-being: "[P]rison sentences (particularly long sentences) are unlikely to deter future crime. Prisons actually may have the opposite effect . . . ."[25]

---

Internal Medicine on September 1, 2020 found that, in comparing 128 individuals on two buses "airborne spread of SARS-CoV-2 seems likely to have contributed to the high attack rate in the exposed bus." Ye Shen, PhD, et al., *Community Outbreak Investigations of SARS-CoV-2 Transmission Among Bus Riders in Eastern China*, JAMA Internal Medicine (Sept. 1, 2020), available at <https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2770172>.

[25] U.S. DOJ Nat'l Instit. of Justice, *Five Things About Deterrence* (June 5, 2016) at 1, available at <https://nij.ojp.gov/topics/articles/five-things-about-deterrence>.

14

Mr. Ferizi has demonstrated through his actions he is ready to return to his family in Kosovo. Having already served what is a significant sentence, Mr. Ferizi should not be required to continue to risk his health, and possibly his life, solely to satisfy a term of years with no further deterrent benefit.

Respectfully submitted,

Ardit Ferizi
By Counsel

_____/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
Assistant Federal Public Defender

Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0879 (T)
(703) 600-0880 (F)
Elizabeth_Mullin@fd.org (email)

# CERTIFICATE OF SERVICE

I hereby certify that on September 8, 2020, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

Pursuant to the Electronic Case Filing Policies and Procedures, a courtesy copy of the foregoing pleading will be delivered to Chambers within one business day of the electronic filing.

By Counsel

_____/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
Assistant Federal Public Defender