STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

BYRON M. JONES (TNBN 010507)
Senior Counsel, Computer Crime and Intellectual Property Section
NATALIE TECIMER (DCBN 1659014)
Trial Attorney, Computer Crime and Intellectual Property Section

    U.S. Department of Justice, Computer Crime and Intellectual Property Section
    1301 New York Avenue NW
    Washington, DC 20005
    Telephone: 202-322-8099
    Byron.Jones@usdoj.gov

ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Ross.weingarten@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 21-00027 WHA |
| Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FOR VINDICTIVE PROSECUTION |
| v. | |
| ARDIT FERIZI, | |
| Defendant. | |

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................3

    i.   Ferizi's Offense Conduct in the Case Prosecuted in the EDVA.........................4

    ii.  Ferizi is Indicted, Pleads Guilty, and Receives a 240-month Sentence in the
       EDVA .......................................................................................................7

    iii. Ferizi's First Motion for Compassionate Release in the EDVA........................10

    iv.  Ferizi's Second Motion for Compassionate Release in the EDVA ..................11

    v.   The Government Appeals the Grant of Compassionate Release and Ferizi is
       charged with New Crimes in the NDCA ..........................................................11

III. ARGUMENT .....................................................................................................13

    B.   The Facts and Timeline Show that the NDCA Charges Against Ferizi Were
       Not Vindictive.................................................................................................15

    C.   The NDCA Prosecution of Ferizi Concerns Distinct Conduct From his EDVA
       Conviction and Sentencing ............................................................................19

IV.  An Evidentiary Hearing is Not Warranted and the Court Should Not Order Discovery.............21

V.   CONCLUSION ...................................................................................................22

# TABLE OF AUTHORITIES

## CASES

*Blackledge v. Perry,*
    417 U.S. 21, 94 S.Ct. 2098 (1974) ............................................................................ 14, 15, 20

*Bordenkircher v. Hayes,*
    434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978) ...................................................... 13

*Fenner v. U.S. Parole Com'n,*
    251 F.3d 782, 788 (9th Cir. 2001) ................................................................................. 16

*North Carolina v. Pearce,*
    395 U.S. 711, 89 S.Ct. 2072 (1969) .................................................................. 13, 14, 15

*United States v. Allen,*
    699 F.2d 453 (9th Cir. 1982) ........................................................ 13, 14, 15, 16, 17, 20

*United States v. Armstrong,*
    517 U.S. 456 (1996) .................................................................................................. 21, 22

*United States v. Burt,*
    619 F.2d 831 (9th Cir. 1980) ......................................................................................... 13

*United States v. Chandia,*
    675 F.3d 329 (4th Cir. 2012) ........................................................................................... 8

*United States v. DeMarco,*
    550 F.2d 1224 (9th Cir., 1977) .......................................................................... 15, 16, 17

*United States v. Feathers,*
    2016 WL 7337518, at *13 (N.D. Cal. Dec. 19, 2016) ................................................. 21

*United States v. Ferizi,*
    2021 WL 5320860 (4th Cir. Nov. 16, 2021) ................................................................. 13

*United States v. Frega,*
    179 F.3d 793, 801 (9th Cir. 1999) ................................................................................. 14

*United States v. Goodwin,*
    457 U.S. 368, 102 S.Ct. 2485 (1982) .............................................................. 13, 14, 15, 19-20

*United States v. Griffin,*
    617 F.2d 1342 (9th Cir.), cert. denied, 449 U.S. 863, 101 S.Ct. 167 (1980) ............... 20

*United States v. Groves,*
    571 F.2d 450 (9th Cir. 1978) .................................................................................... 18, 19

*United States v. Jenkins,*
   504 F.3d 694 (9th Cir. 2007) ............................................................................. 18

*United States v. Kuburovich,*
   852 Fed.Appx. 291 (2021) ................................................................................. 22

*United States v. Lovasco,*
   431 U.S. 783, 97 S.Ct. 2044 (1977) .................................................................. 20

*United States v. Martinez,*
   105 F. App'x 190 (9th Cir. 2004) ...................................................................... 21

*United States v. Martinez,*
   785 F.2d 663 (9th Cir. 1986) ....................................................................... 19, 20

*United States v. Mumuni Saleh,*
   946 F.3d 97 (2d Cir. 2019) .................................................................................. 5

*United States v. One 1985 Mercedes,*
   917 F.2d 415 (9th Cir. 1990) ............................................................................. 21

*United States v. Robison,*
   644 F.2d 1270 (9th Cir. 1981) ............................................................... 17, 20, 21

*United States v. Sanders,*
   211 F.3d 711 (2d Cir. 2000) ........................................................................... 21-22

*United States v. Wright,*
   937 F.3d 8 (1st Cir. 2019) ................................................................................ 4, 5

*United States v. Yagman,*
   2007 WL 9724368 (C.D. Cal. May 3, 2007) ................................................... 21

## **STATUTES**

18 U.S.C. § 1028 ................................................................................................. 12

18 U.S.C. § 1028(a)(2) ....................................................................................... 12

18 U.S.C. § 1028A .............................................................................................. 11

18 U.S.C. § 1028A(a)(2) ...................................................................................... 7

18 U.S.C. § 1029 ................................................................................................. 12

18 U.S.C. § 1029(a)(3) ....................................................................................... 11

18 U.S.C. § 1343 ................................................................................................. 11

18 U.S.C. § 1349 ................................................................................................. 11

18 U.S.C. § 2332b(g)(5)(A) ........................................................................................................ 7

18 U.S.C. § 2339B ...................................................................................................................... 7

18 U.S.C. §§ 1030(a)(2)(c) ........................................................................................................ 7

## **RULES**

Fed. R. Crim. P. 16 .................................................................................................................... 20

U.S.S.G. § 2M5.3(b)(1)(E) ......................................................................................................... 7

U.S.S.G. § 3A1.4 ........................................................................................................................ 7

## I.   INTRODUCTION

The defendant, Ardit Ferizi, has moved this Court to dismiss the indictment in this case for vindictive prosecution. The government opposes the motion, and this Court should deny it without ordering discovery and without holding an evidentiary hearing. The defendant has not shown that the government's current prosecution of Ferizi was brought to punish him for exercising a constitutional or statutory right. Instead, the government charged Ferizi—an accomplished and sophisticated computer hacker and ISIS sympathizer—in this District with crimes committed while he was in prison solely because of the danger to the United States posed by his early release from prison approximately 15 years before his sentence was due to be completed.

As discussed below, under controlling Ninth Circuit case law, a prosecution is not presumed vindictive when brought in response to a sentencing decision in another federal case—and here it is the early release from a lengthy sentence that preceded Ferizi's prosecution in this district.

Until recently, Ferizi was serving a 20-year sentence following his conviction in the Eastern District of Virginia ("EDVA") for terrorism-related offenses. While he was incarcerated at USP Terre Haute, a maximum-security prison, Ferizi committed new crimes. Specifically, Ferizi provided his brother the means to download Ferizi's Google Drive which contained the personal identifying information of American and Israeli citizens which appear to be stolen. The government did not immediately initiate a prosecution of Ferizi because he was already serving a long sentence. But when a judge in the EDVA granted Ferizi's motion seeking compassionate release—effectively reducing his sentence by approximately 15 years—that caused a risk of great harm to the United States given Ferizi's prior offense conduct and his conduct while incarcerated. The government then brought the charges pending in this case before the defendant was deported back to his home country, where he could not be easily supervised or monitored by U.S. authorities. The defendant has not shown any likelihood that the government's motive for bringing this prosecution was to punish Ferizi for seeking compassionate release in the EDVA. Rather, these charges were brought to protect citizens of the United States from the risk of significant harm if Ferizi were to be released, and to deter Ferizi's continuing criminal conduct.

Prosecuting Ferizi for his criminal conduct while in custody was not of such urgent necessity when Ferizi was serving the 240-month sentence for the convictions that he sustained in the EDVA. That remained true when Ferizi's motion for compassionate release was initially denied by the district court in the EDVA. When the COVID-19 pandemic worsened, however, Ferizi renewed his motion for compassionate release and the district court in the EDVA granted his motion and reduced his sentence to time served.[1] At that point, Ferizi's release to his home country presented a significant danger to the United States because Ferizi (1) previously provided U.S. military member names and identifying information to ISIS to publish on a "kill list" (the conduct for which he was convicted in the EDVA); (2) is an accomplished and long-standing hacker; and (3) attempted to have his brother access stolen personal information while in prison, thereby showing that he has not been deterred from committing future offenses.

The defendant now argues that this prosecution is vindictive. It is not. First, Ferizi cannot argue that the threat of prosecution here, which will likely lead to a shorter sentence than the 20 years he was serving, would deter him or others in his situation from seeking compassionate release. Thus, no punitive or improper motive should be presumed here. Second, the government has argued, both before and after his initial conviction, that Ferizi's release poses a grave risk of harm to citizens of the United States. That the government did not bring charges earlier does not make it a vindictive prosecution. Instead, it is an appropriate exercise of prosecutorial discretion to withhold or not pursue potentially viable charges against someone already serving a lengthy prison sentence. When that changed and Ferizi was to be sent home, where he could not be monitored by U.S. authorities, the government charged Ferizi based on crimes he committed while in custody. Charging Ferizi in the NDCA protected United States citizens from a hacker who stole identifying information about U.S. military personnel and provided it to ISIS, which published the information on an ISIS "kill list." That threat did not exist when Ferizi was slated to serve out his 20-year prison sentence. As a result, this Court should deny the defendant's motion for vindictive prosecution.

---

[1] That decision by the district court in the EDVA granting Ferizi's motion for compassionate release was appealed to the Fourth Circuit. The Fourth Circuit remanded that decision back to the district court and that decision now is pending reconsideration in the district court.

## II.     BACKGROUND

Ferizi is a Kosovo citizen, a sophisticated and accomplished computer hacker, and sympathizer of the Islamic State of Iraq and al-Sham (ISIS).  He was convicted in 2016 in the EDVA for providing material support to ISIS and for unauthorized computer access.  *See* Def. Ex. A, Dkt. No. 40-2: *United States v. Ferizi*, 1:16-CR-00042-LMB (E.D.Va.).  In that case, Ferizi admitted that he breached the servers of a U.S. company, stole personal identifying information of more than 100,000 of its customers, and used that information to specifically identify U.S. military and government personnel.  Ferizi identified approximately 1,300 such individuals and sent the information to a high-profile ISIS member in Syria, intending for ISIS to "hit them hard."  Soon after, the ISIS member published a "kill list" with names, emails, passwords, phone numbers, locations, and military divisions of the 1,300 individuals via Twitter, adding the following message: "the soldiers of the khilafah, who soon with the permission of Allah will strike at your necks in your own lands!"

In sentencing Ferizi to 240 months' imprisonment in 2016, the district court in the EDVA found that he provided material support to ISIS with the intent, knowledge, or reason to believe it would be used to commit or assist in the commission of a violent act.  The Court further rejected Ferizi's argument that his crimes should be treated less seriously because his victims did not suffer physical harm.

In 2018 and 2019, when the conduct in the instant case occurred, Ferizi was serving his sentence at USP Terre Haute, a maximum-security facility in Indiana.  After the onset of the COVID-19 pandemic, Ferizi brought an initial motion for compassionate release.  In August 2020, the district court in the EDVA denied Ferizi's first motion for compassionate release.  The government argued, and the district court agreed, that Ferizi was too dangerous to release and that doing so would not protect the safety of the community from future hacking by him.

Ferizi filed a second motion for compassionate release on November 11, 2020.  In December 2020, the district court granted that motion, ordering him deported to Kosovo.  In doing so, the district court rejected the government's arguments that releasing Ferizi to a foreign country would not protect the public from further crimes of the defendant.  The government appealed the district court's compassionate release order.

On January 11, 2021, Ferizi was charged by a complaint in the Northern District of California with wire fraud and aggravated identity theft. Dkt. No. 1. These new and distinct charges are based on Ferizi's conduct while in prison on his convictions in the case prosecuted in the EDVA. Specifically, the government alleges that while in custody, Ferizi provided his brother access to his email accounts allowing his brother to download Ferizi's Google Drive, which included what appears to be hacked and stolen information, some of which included the personal and financial information of American and Israeli citizens. On January 21, 2021, a five-count indictment was returned in this case, charging Ferizi with conspiracy to commit wire fraud, substantive wire fraud, possession of an unauthorized access device, transfer of stolen identification documents, and aggravated identity theft. Dkt. No. 4.

On November 16, 2021, the Fourth Circuit remanded back to the district court for the EDVA the order granting compassionate release to Ferizi so that the district court could consider how the charges in the Northern District of California, or other relevant evidence revealed since the district court's order of release, impact the discretionary § 3553(a) analysis for compassionate release, and for such other such other and further proceedings as may be appropriate. The parties have submitted additional briefing, but the district court has not yet ruled on Ferizi's motion for compassionate release since remand.

### i. Ferizi's Offense Conduct in the Case Prosecuted in the EDVA

On September 21, 2014, ISIS' spokesperson, Abu Muhammad al-Adnani, openly called for attacks against citizens and military employees of countries participating in the U.S.-led coalition against ISIS. *See* Weingarten Decl., Ex. A, EDVA ECF[2] No. 36 at 2. On March 20, 2015, ISIS member Junaid Hussain, acting under the banner of "the Islamic State Hacking Division," posted online a "kill list" that included 100 names and addresses of U.S. military personnel. *Id.* Hussain was a Syria-based ISIS member actively engaged in supporting the group's efforts to conduct terrorist attacks against U.S. military members and government personnel. *Id.* at 4.[3]

---

[2] References to documents from the docket in the case in the EDVA are denoted with "EDVA ECF" and copies of those documents will be attached to the Weingarten Decl. and filed with the Court.

[3] The Junaid Hussain referenced herein is the same Hussain who has figured prominently in other recent prosecutions, such as the plot to fulfill an ISIS fatwa by killing American activist and commentator Pamela Geller. *See United States v. Wright*, 937 F.3d 8 (1st Cir. 2019); *see also United States v. Mumuni Saleh*, 946 F.3d 97, 102 (2d Cir. 2019) ("Mumuni was offered a pressure- cooker

About one month later, Ferizi, then residing in Malaysia and using the Twitter moniker "@Th3Dir3ctorY," began communicating with an ISIS member known as Tariq Hamayun. (EDVA ECF No. 36 at 3.)  Hamayun used the Twitter moniker "@Muslim_Sniper_D."  *See* Ferizi Presentence Investigation Report (hereinafter "EDVA PSR")[4] ¶ 11.  On April 26-27, 2015, Ferizi and Hamayun communicated through Twitter.  *See* Weingarten Decl., Ex. B: EDVA ECF No. 2 at 10; Weingarten Decl., Ex. A at 3.  At one point, Ferizi told Hamayun that he had "4 million data of kuffar countrys which attacking islamic state."  *See* Weingarten Decl., Ex. C: EDVA ECF No. 54-1 at 7.  Ultimately, Ferizi provided Hamayun with screenshots of credit card information belonging to 68 individuals.  *See* EDVA PSR ¶ 11; *see also* Weingarten Decl., Ex. A at 3.  Later, Hamayun commented on this information, "MashAllah [what God has willed] brother I check some of this info its really good[,]" and added, "Can do some damage inshallah[.]"  Weingarten Decl., Ex. C at 7.  Ferizi asked Hamayun to confirm his identity as "Abu Al-Britani," whom he knew to be an ISIS member.  *See* EDVA PSR ¶ 11. Hamayun confirmed his identity and association with Junaid Hussain, a known ISIS member and leader of the ISIS Hacking Unit, claiming that Hussain "told me a lot about u."  *Id.*; *see also* Weingarten Decl., Ex. C at 7.  Hamayun also implored Ferizi to "come and join us in the Islamic state."  Ferizi responded: "InshAllah," or God-willing.  *See* Weingarten Decl., Ex. C at 7.  These communications show conclusively that Ferizi was communicating with ISIS fighters and was, himself, and ISIS sympathizer who tried to aid ISIS through hacking.

Beginning in June 2015, Ferizi unlawfully accessed the Arizona-based server of a U.S. company. Weingarten Decl., Ex. A at 3.  Ferizi obtained administrator-level access and spent the next two months extracting the personal identifying information (PII) of over 100,000 customers.  *Id.*  Ferizi specifically searched for email addresses ending in ".gov" or ".mil." and thereby culled the PII of approximately 1,300 U.S military and government personnel.  *Id.*

---

bomb from Saleh for his attack. When Mumuni asked Saleh whether it would be permissible from a religious standpoint to die during his attack on law enforcement, Saleh contacted Junaid Hussain ("Hussain"), a notorious Syria-based ISIS attack facilitator. Hussain expressly authorized Mumuni's suicide attack").

[4] The government will file Ferizi's Presentence Investigation Report from his 2016 EDVA conviction separately under seal.

Ferizi then provided the stolen information to ISIS "with the understanding that ISI[S] would use the PII to hit them hard."  *Id*. at 4.  Ferizi did this by contacting Junaid Hussain, whom he knew was a member of ISIS actively engaged in supporting the group.  *Id*. at 3–4.  At one point, Hussain told Ferizi: "we will make like a message inshAllah […] like u know the hit list I made […] we will make message to kuffar and release the .mil and .gov[.]"  Weingarten Decl., Ex. C at 10–11.  Soon after, Hussain stated "Allahu Akbar [...] Akhi this will hit them hard[.]"  *Id*. at 11.  Ferizi immediately responded "yes brother inshalllah[.]"  *Id*.[5]  In other words, the record from the EDVA prosecution is clear that Ferizi provided the names and personal information of U.S. military and government personnel to ISIS for the express purpose of causing harm to those individuals, and America more broadly.

On August 11, 2015, Hussain, acting in the name of "the Islamic State Hacking Division," issued a public message over Twitter with the heading: "NEW: U.S. Military AND government HACKED by the Islamic State Hacking Division!"  Weingarten Decl., Ex. A at 4–5; Ex. B at 12.  The message contained a link to a 30-page document containing the names, e-mail addresses, passwords, locations, and telephone numbers of the 1,300 U.S. military members and government personnel Ferizi had unlawfully obtained. The document, addressed to the "Crusaders" conducting "bombing campaign[s] against the muslims," stated as follows:

> we are in your emails and computer systems, watching and recording your every move, we have your names and addresses, we are in your emails and social media accounts, we are extracting confidential data and passing on your personal information to the soldiers of the khilafah, who soon with the permission of Allah will strike at your necks in your own lands!

*See* Weingarten Decl., Ex. A at 4–5.  Hussain was later killed by an airstrike in Syria.

During the relevant period, Ferizi sought to aid or promote ISIS in several other ways for which he was never charged.  For example, he administered a website that hosted dozens of ISIS videos.

---

[5]  Earlier in the conversation, a similar exchange ensued:

Ferizi: there is a huge db [database]
Hussain: Allahu Akbar
Hussain: we need to hit them hard
Ferizi: yes, inshaAllah
Hussain: ok akhi we will release biidnillah
Ferizi: just when we hit hit them strong

*See* Weingarten Decl., Ex. C: EDVA ECF No. 54-1 at 9.

Weingarten Decl., Ex. C: EDVA ECF No. 54-1 at 3–5.  He offered his technical assistance at three now-suspended pro-ISIS Twitter accounts, stating as follows: "brother wait till im making the script which u can upload and never get deleted (DEDICATED SERVERS)[.]"  Weingarten Decl., Ex. B at 13–14.  And in private internet chats, he defended ISIS' release of hit lists containing U.S. service members' information ("cos they was the people who killed people in iraq and syria [...] if someone kill your family and run would u not find him and kill him?"), and the group's highly publicized beheadings of civilians ("ill tell u they never kill someone without reasons believe me i guarantee u[.]").  Weingarten Decl., Ex. C: EDVA ECF No. 54-1 at 7.

On October 6, 2015, Ferizi was charged by criminal complaint in the EDVA.  Malaysian authorities arrested him and extradited him to the United States on or about January 22, 2016.

### ii. Ferizi is Indicted, Pleads Guilty, and Receives a 240-month Sentence in the EDVA

On February 16, 2016, Ferizi was charged in a four-count indictment with conspiring to provide and providing material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B (Counts One and Two); unauthorized computer access, in violation of 18 U.S.C. §§ 1030(a)(2)(c), (c)(2)(B)(ii) (Count Three); and aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(2).

On June 15, 2016, Ferizi pled guilty to Counts Two and Three of the indictment.  As part of his plea, Ferizi agreed that "[d]uring this entire period of the [charged conduct], [he] knew ISIS had engaged in and was engaging in terrorist activity and terrorism."  Weingarten Decl., Ex. A at 3.  Ferizi agreed that his actions "were done willfully and knowingly and with the specific intent to violate the law, and were not committed by mistake, accident, or other innocent reason."  *Id*. at 3, 5.  He further admitted that he provided ISIS with the victims' personal identifying information (PII) with the understanding that ISIS would use the PII to "hit them hard," referring to U.S. military or government personnel.  *Id*. at 4.[6]  In pleading guilty to Count Three, Ferizi admitted that he intentionally accessed the victim company's server without authorization and that he did so in furtherance of the material

---

[6]  As Ferizi himself put it, "just when we hit hit them strong." (Weingarten Decl., Ex. C: EDVA ECF No. 54-1 at 9.)

support violation.  *See* § 1030(a)(2)(C), (c)(2)(B)(ii).  In other words, Ferizi admitted that he hacked the

victim company to promote, advance, or further the material support violation.  Ferizi also stipulated to

the application of a 12-level upward adjustment under U.S.S.G. § 3A1.4 because his material support

offense was a felony involving a federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(A).

Weingarten Decl., Ex. D at 3–4.  In doing so, Ferizi necessarily accepted that he had "the specific intent

required by the terrorism enhancement." *United States v. Chandia*, 675 F.3d 329, 331 (4th Cir. 2012).

Prior to sentencing, the Office of Probation prepared a Presentence Investigation Report (PSR).

As calculated by the PSR, Ferizi's Guideline range was 360 months to life imprisonment, capped at the

300-month combined statutory maximum.  The PSR recommended the additional application of a two-

level base offense increase under U.S.S.G. § 2M5.3(b)(1)(E) for the provision of material support with

the intent, knowledge, or reason to believe it would be used to commit or assist in the commission of a

violent act.  EDVA PSR ¶ 30.  Ferizi objected to the application of § 2M5.3(b)(1)(E), but U.S. Probation

insisted on its applicability:

> The defendant sought to obtain the personal information of specific individuals **for the sole purpose** of providing their information to ISIL, knowing ISIL had targeted that very group as a group to be harmed. As detailed in the Statement of Facts, in June of 2015, the defendant reached out to an individual he knew to be a terrorist and provided him with the personal information of United States military and government personnel. He was aware the individual and his ISIL colleagues were exerting efforts to conduct violent attacks against United States military and government personnel. He also knew that ISIL planned to "hit them hard."
>
> The guideline applications use a preponderance standard, and this officer believes it is more likely than not that the defendant deliberately sought the victims' information knowing ISIL members would use it to engage in acts of violence against them.

*See* EDVA PSR at 18–19 (Addendum) (emphasis added).

In his sentencing submission, Ferizi continued to object to the application of the enhancement,

arguing that he did not intend to "bring violence to anyone" but was instead merely "boast[ing] about his

hacking exploits on-line[.]"  Weingarten Decl., Ex. E: EDVA ECF No. 53 at 4.  The district court

subsequently "accept[ed] the guidelines as they've been calculated, because I think they are correct

given the facts of this case."  Weingarten Decl., Ex. F: EDVA ECF No. 77 at 27.

At sentencing, on September 23, 2016, the district court asked Ferizi if he had "any true understanding of what [he] actually did[.]" *Id*. at 25. Ferizi claimed he did, to which the Court responded "I'm still not sure. Why did you do it?" *Id*. Ferizi then claimed that "it was something -- happened very fast." *Id*. Unpersuaded, the district court responded as follows: "It didn't happen that fast. You're communicating back and forth over a period of time, aren't you?" *Id*. Later, the Court noted: "Well, this was a case where it wasn't a one time incident. You had plenty of time to think about what was going on." *Id*.

At sentencing, Ferizi attempted to minimize the level of harm suffered by the 1,300 victims whose PII was released on the internet, arguing that no victims were physically harmed. But the district court rejected these arguments, stating "although the defense has argued that the victims are not victims as -- as much as in the other case that the Government has cited, just having your name on a list knowing that you've been identified to a terrorist group, in my view, is sufficiently terrorizing for those people on the list. And their letters certainly attest to that fact." *Id*. at 27. Continuing, the district court added that one victim "who has a very unique name, in particular, mentions that maybe the only name in that particular area would make it very easy to find that person. And the fact that they are basically on a hit list making them basically targets is very, very serious." *Id*.[7] An individual within the EDVA, subsequently identified as Haris Qamar, "was arrested for … the fact that he drove by the homes of two individuals in Virginia whose names and addresses were on the kill list that Junaid Hussain posted in March of 2015." *Id*. at 12.

The district court then imposed a 240-month sentence—comprised of 180 months for the material support conviction and 60 months for the hacking conviction—and in doing so, noted Ferizi's years-long involvement in hacking:

> Because of the need, among other things, for general deterrence, the need to make sure this defendant is deterred from such future conduct, given his track record going back five or six years with hacking, the Court is satisfied that a total sentence of 240 months is sufficient but not greater than necessary to achieve the purposes of Section 3553(a).

*Id*. at 27–28.

---

[7] Another victim impact statement stated: "I have to live constantly under the threat that someone might actually arrive at my residence and harm me or my family members."

The district court also imposed a 10-year term of supervised release, which included a special condition that Ferizi was "not permitted to have any contact or communications whatsoever with any known terrorist, terrorist organizations, or any known hackers." *Id*. at 29–30. The district court also imposed a special condition that Ferizi "satisfactorily participate in such mental health treatment as directed by the probation office with an emphasis on deradicalization." *Id*. at 29. Finally, and importantly, the district court imposed a special condition that Ferizi not "possess or use any computer" without permission from the probation office and directed the probation office to "monitor any communications" Ferizi might have via computer. *Id*. at 30. As argued below, these conditions would be impossible to enforce if the defendant is returned to Kosovo.

### iii. Ferizi's First Motion for Compassionate Release in the EDVA

On August 7, 2020, Ferizi, then residing at USP Lewisburg in Pennsylvania, filed a *pro se* motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The district court appointed counsel who filed a supplemental memorandum arguing that Ferizi's asthma and obesity were factors placing him at a higher risk of suffering complications should he contract COVID-19. *See* Weingarten Decl., Ex. G: EDVA ECF No. 89. Given these conditions, Ferizi asked to be released to Kosovo, where he would reside with his family.

The government opposed the motion, in part, due to the seriousness of Ferizi's offense and the government's inability to supervise him in a foreign country. *See* Weingarten Decl., Ex. H: EDVA ECF No. 95. The government noted that if released, Ferizi would "be entirely outside the jurisdiction of the district court and the supervision of the U.S. Probation Office, free to resume his online activities unmonitored by U.S. law enforcement or the court." *Id*. at 17. Finally, the government argued that Ferizi's risk of recidivism was too high to warrant his release and that this risk posed a danger to the community. *Id*.

On October 6, 2020, the district court held a hearing. *See* Weingarten Decl., Ex. I: EDVA ECF No. 100. There, the district court identified several logistical concerns relating to Ferizi returning to Kosovo. The district court then denied Ferizi's motion in light of these logistical obstacles, as well as the government's concerns about its inability to ensure the safety of the community once the defendant left the U.S. As the district court stated:

Back in 2016… it was interesting that he did voice issues with the United States, and he is, obviously, a fairly skillful hacker. I don't know what kinds of guarantees there could be placed on him that he would not reengage in hacking activities aimed at the United States. If he were being released domestically, I would have ways of controlling him. I could put him on computer monitoring surveillance by the probation office, I could have him on GPS monitoring, I could do all sorts of things, but I can't do that when he's over in Kosovo. And so, the danger that he poses is out there. I'm not saying it's a high risk, but it's certainly not the least risk, and he is mentally unstable based upon the mental health history here. So I have to look at that in terms of the 3553(a) balancing factor because the safety of the community is definitely a factor that goes into any of these types of decisions.

Weingarten Decl., Ex. I: EDVA ECF No. 100 at 9 –10.

### iv. Ferizi's Second Motion for Compassionate Release in the EDVA

On November 11, 2020, Ferizi, then residing at FCI Gilmer in West Virginia, filed a second motion for compassionate release. Weingarten Decl., Ex. J: EDVA ECF No 101. The crux of Ferizi's renewed motion was that FCI Gilmer was experiencing an outbreak of COVID-19 cases. Ferizi also represented that he had resolved the practical concerns regarding traveling to Kosovo and that nothing barred his return to his home country. The government again opposed the motion, stressing that the changed circumstances did not alter the seriousness of Ferizi's offense or the government's inability to supervise a computer hacker in Kosovo.

On December 3, 2020, the district court granted Ferizi's motion and reduced his sentence to time served. Weingarten Decl., Ex. K: EDVA ECF No. 105. In doing so, the district court concluded that Ferizi was particularly susceptible to COVID-19 and had shown a likelihood of contracting the disease in prison. The district court recognized that Ferizi committed a "serious offense" and that "his actions were harmful to the individuals whose names appeared on the list posted by ISI[S]." *Id*. at 6–7. Nevertheless, the district court found that Ferizi was a suitable candidate for release and return to Kosovo.

### v. The Government Appeals the Grant of Compassionate Release and Ferizi is charged with New Crimes in the NDCA

On December 15, 2020, the government appealed the district court's release order to the Court of Appeals for the Fourth Circuit. In its opening brief, the government argued that the district court abused its discretion by reaching conclusions at odds with both the factual record and the district court's own

1    prior conclusions.  *See* Weingarten Decl., Ex. L: Gov't Opening Br., *United States v. Ferizi*, No. 20-
2    7830 (4th Cir. filed Feb. 9, 2021).

3         On January 8, 2021, while in immigration custody, Ferizi was charged by complaint in this case
4    with wire fraud, in violation of 18 U.S.C. § 1343, and aggravated identity theft, in violation of 18 U.S.C.
5    § 1028A.  Dkt. No. 1.  On January 21, 2021, Ferizi was charged in a five-count indictment with
6    conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; wire fraud, in violation of § 1343;
7    possession of an unauthorized access device, in violation of 18 U.S.C. § 1029(a)(3); transfer of stolen
8    identification documents, in violation of 18 U.S.C. § 1028(a)(2); and aggravated identity theft, in
9    violation of § 1028A.  Dkt. No. 4.

10        These charges are based on Ferizi's conduct in prison while incarcerated on his convictions from
11   the EDVA.[8]  In sum, the government alleges that in or around 2017 and 2018, while in custody, Ferizi
12   contacted his brother and provided to his brother the means to access Ferizi's Google Drive account
13   databases.  Those databases contained stolen and unauthorized personally identifiable information and
14   online account access data, including a database of 51 sets of partial credit card numbers, emails, and
15   passwords related to Macy's credit card accounts.  Ferizi's Google Drive account also contained (1) a
16   database of 55 sets of stolen login credentials titled "Untitled spreadsheet," (2) a database of 438,334
17   rows of email addresses titled "USA-Emails-Clean," and (3) a database of more than 17,000 rows of
18   information regarding approximately 5,000 Israeli citizens.  The filename of the third database is "Op
19   Israel," which refers to an organized, annual, and coordinated cyber-attack by hackers who target Israeli
20   government websites and citizens.  Included among the data belonging to Israeli citizens were numerous
21   "Tuedat Zehut," the Israeli Identity Card number issued by the Israeli government for identification
22   documents for its citizens and which constituted "authentication features" as defined by 18 U.S.C. §
23   1028, and associated statutes.  The data also included personal information that constituted "access
24   devices" as defined by 18 U.S.C. § 1029, and associated statutes.  The government alleges that the
25   access to this information was for the purpose of committing fraud.

26

27

---

28        [8] For a more fulsome description of the conduct charged in this case, *see* Ferizi Complaint, Dkt.
No. 1.

On November 16, 2021, well after charges were filed in the NDCA, the Fourth Circuit remanded back to the district court in the EDVA "to consider in the first instance how the new charges, or other relevant evidence revealed since the district court's order of release, impact the discretionary § 3553(a) analysis for compassionate release[.]"  *United States v. Ferizi*, No. 20-7830, 2021 WL 5320860 (4th Cir. Nov. 16, 2021).  Ferizi's motion seeking compassionate release remains pending before the district court in the EDVA.

## III.    ARGUMENT

The Court should deny Ferizi's motion to dismiss for vindictive prosecution because he has not shown that the charges were vindictive or sought to punish him for exercising a constitutional or statutory right.  Instead, the evidence and procedural history shows plainly that the government charged Ferizi in the NDCA due to the safety threat presented by his imminent release and deportation, which case law confirms is an appropriate use of prosecutorial discretion.

### A.  Applicable Law

The right to due process of law is violated where the government undertakes a course of action with the objective to penalize a person for exercising a protected statutory or constitutional right.  *United States v. Goodwin*, 457 U.S. 368, 372 & n.2, 102 S.Ct. 2485, 2488 & n.2 (1982); *United States v. Allen*, 699 F.2d 453, 460–61 (9th Cir. 1982).  "After all, penalizing a person for doing what the law plainly allows him to do 'is a due process violation of the most basic sort.'" *United States v. Burt*, 619 F.2d 831, 836 (9th Cir. 1980), *quoting Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 667, 54 L.Ed.2d 604 (1978).

In *North Carolina v. Pearce*, 395 U.S. 711, 89 S.Ct. 2072 (1969), the Supreme Court held that due process prohibits a trial judge from imposing a harsher sentence on retrial in retaliation for the defendant's successful exercise of the statutory right to challenge his original conviction. "[S]ince the fear of such vindictiveness may unconstitutionally deter defendant's exercise of the right to appeal or collaterally attack his first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." *Id*. at 725, 89 S.Ct. at 2080 (footnote omitted).  In order to assure the absence of such retaliatory motivation, the Court concluded that whenever a trial judge imposes a more severe sentence upon retrial, the reasons for the

increase must relate to actions of the defendant occurring after the original sentencing and must affirmatively appear in the record. *Id.* at 726, 89 S.Ct. at 2081. The Court in *Pearce* applied a "presumption of vindictiveness," which may be overcome only by objective information in the record justifying the increased sentence. *See Goodwin, supra*, 457 U.S. at 374, 102 S.Ct. at 2489. In *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098 (1974), the Supreme Court extended the rule of *Pearce* to situations involving apparent vindictiveness by prosecutors.

However, presumption of vindictiveness is not warranted "simply because the prosecutor's actions . . . would not have been taken but for exercise of a defense right." *United States v. Frega*, 179 F.3d 793, 801 (9th Cir. 1999) (citation omitted). Rather, the presumption is triggered only when a reasonable likelihood exists of "prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights." *Id.* (citation omitted).

The facts here are analogous to those in the controlling *Allen* case. In *Allen*, the Ninth Circuit affirmed the district court's refusal to dismiss an indictment for vindictive prosecution where the government waited to bring an indictment until after it learned what sentence was imposed in an unrelated case brought against the same defendant in another district. *Allen*, 699 F.2d at 461. The government conceded that the reason for this delay was to await the disposition of an unrelated criminal prosecution against Allen in the District of Oregon before deciding whether to go forward with its case in the Central District of California. *Id.* As the government stated in its brief in *Allen*, "[t]his decision was made because it was believed that if the defendant received a substantial sentence on the Oregon case, there would be no compelling interest to proceed on the present case." *Id.* Allen argued that this was an improper, vindictive justification which penalized him for seeking and obtaining favorable treatment at the time of his sentencing in the Oregon case. *Id.*

The Ninth Circuit agreed with the government's position, concluding that the decision to prosecute Allen was not made in response to anything Allen did but in consideration of the sentence he received. The Court reasoned that Allen's conviction could be reversed "only if a *presumption* of vindictiveness—applicable in all cases—is warranted." *Id. citing, Goodwin, supra*, 457 U.S. at 381 (emphasis in original; footnote omitted). Indeed, the Ninth Circuit cautioned that "[g]iven the severity

of such a presumption [ ]—which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct—the Court has [presumed vindictiveness] only in cases in which a reasonable likelihood of vindictiveness exists." *Id.* at 460, *quoting Goodwin*, at 373, 102 S.Ct. at 2488. In *Allen*, even assuming that the government's action could properly be characterized as a response to the exercise of some procedural rights, the Ninth Circuit did not agree that such action posed a realistic likelihood of vindictiveness that would necessitate the broad prophylactic rule of *Pearce* and its progeny. *Id.* at 461. The Court concluded, therefore, that a presumption of vindictiveness is not warranted when the government bases its decision to prosecute on the severity of the sentence received by a defendant in an earlier unrelated prosecution. *Id*.

The Ninth Circuit in *Allen* distinguished its decision in *United States v. DeMarco*, 550 F.2d 1224 (9th Cir., 1977). In *Demarco*, the Ninth Circuit found an opportunity for vindictiveness where the government sought an additional indictment after the defendant exercised his statutory right to change venue in an earlier prosecution. In affirming the dismissal of the indictment due to the apprehension of vindictiveness, the Ninth Circuit observed that the prosecutor "'ha[d] considerable stake in discouraging' defendants from exercising their venue rights when the effect 'will clearly require increased expenditures of prosecutorial resources' because the prosecutor loses the advantage of trying alleged conspirators together and must also conduct two trials in different parts of the country." *Id.* at 1227, *quoting Blackledge, supra*, 417 U.S. at 27, 94 S.Ct. at 2102. In *Allen*, by contrast, the Ninth Circuit could not perceive any increased burden on the prosecutor arising from Allen's request for a more lenient sentence at his Oregon sentencing. *Allen*, at 461.

### B. The Facts and Timeline Show that the NDCA Charges Against Ferizi Were Not Vindictive

In the case before this Court, the government readily acknowledges that it did not seek the indictment in this case until it appeared that Ferizi might be released from custody fifteen years earlier than anticipated in the case prosecuted by the EDVA. However, there is nothing in this concession nor is there evidence in this case that could give rise to a claim of actual vindictiveness. *See Allen*, 699 F.2d at 460. Indeed, it was Ferizi's potential release and the danger that would present—not his exercise of a constitutional right—that caused the government to charge him, which is plainly an appropriate use of

1   prosecutorial discretion.  Like in *Allen*, the sentence Ferizi received in the EDVA case after it was

2   reduced by nearly 15 years is an appropriate consideration for the government to consider in bringing

3   new charges.  The circumstances and timing of this prosecution—which are all the defendant points to

4   in his brief—do not as a matter of law give rise to a presumption of vindictiveness, and the burden does

5   not shift to the government.

6          Just as Allen was not charged because of anything he did, but because of the sentence he

7   received, so too was Ferizi not punished for seeking compassionate release, but because of the danger

8   presented when his request was granted.  First, Ferizi does not allege actual vindictiveness by the

9   government.  *See* Dkt. No. 40 at 15-16.  He relies entirely on the presumption that he argues arises from

10  the circumstances and timing of the new charges.  However, the facts, even as presented by the

11  defendant, do not support the Court in finding and applying a presumption of vindictiveness in this case.

12         Just like in *Allen*, federal prosecutors have no motive to retaliate against Ferizi for prevailing

13  upon his motion seeking compassionate release in the case pending in the EDVA.  As argued below, the

14  EDVA charges and the NDCA charges are distinct factually and temporally—Ferizi was charged in the

15  EDVA for hacking while abroad in Malaysia in 2015; he was charged in the NDCA for conduct that

16  occurred while in custody in Indiana in 2017-2018.[9]  In addition, a compassionate release motion would

17  not trigger a retaliatory response for two reasons:  first, it would not cause the government to engage in

18  self-vindication because it doesn't undermine the legitimacy or conduct of the prosecution.  *See Fenner*

19  *v. U.S. Parole Com'n*, 251 F.3d 782, 788 (9th Cir. 2001) ("As a matter of logic, vindictiveness becomes

20  a danger only where an event prods [the government] into a posture of self-vindication.  Absent a

21  triggering event, the court will not presume vindictiveness.") (citation omitted).  And second, the filing

22  of the compassionate release motion did not require any additional prosecutorial resources.  *See*

23  *Demarco*, 550 F.2d at 1227 (prosecutor had "considerable stake in discouraging" defendant from

24  exercising his rights because it would have "clearly require[d] increased expenditures of prosecutorial

25  resources").

26

27         [9] The fact that Ferizi possessed the information at issue in the NDCA indictment in 2016 is of no

28  moment.  The crime charged in the NDCA indictment involves attempting to access and make use of
that information while in custody in 2018.

There was no attempt to dissuade Ferizi from seeking compassionate release in the EDVA, either his first or second time moving for release, by threatening him with prosecution on other charges. Nor would the grant of Ferizi's motion for compassionate release create a burden for the government that it may seek to avoid, such as a new trial. If anything, if Ferizi's motion for compassionate release is successful, it will *lessen* the burden on the government, as the government will deport him to Kosovo where he cannot be supervised. Thus, this case is not like *Demarco*, where the government sought to avoid an added burden by threatening new charges against a defendant seeking to exercise his rights related to the venue of his trial. Here, there is no added burden on the government (and arguably the burden on the government is decreased) if Ferizi's compassionate release motion is successful.

Moreover, the presumption of vindictiveness does not make sense here given the unusual facts of this case. As discussed above, the Court reasoned in *Allen* that the defendant's conviction could be reversed "only if a *presumption* of vindictiveness—applicable in all cases—is warranted." 699 F.2d at 461. Here, the facts make this case so unusual that no other defendant would be chilled in the exercise of their rights. First, this case involves terrorism and national security risks, which differentiate it from other cases. Second, the NDCA charges are likely to result in a lower sentence than the approximately 15-year balance on Ferizi's remaining sentence in the EDVA. Thus, even if he knew the NDCA charges were going to be filed, Ferizi was still incentivized to move for compassionate release because he is still likely to do less time in custody even if convicted in the NDCA than if he were to complete his EDVA sentence. *See United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir. 1981) ("In the instant case, the defendant exercised procedural rights in a successful attempt to avoid the death penalty. The subsequent federal prosecution for a crime punishable by a maximum of ten years in prison would not deter the defendant, nor anyone similarly situated, from seeking to avoid the loss of his life."). It cannot be said, then, that the type of charges brought in the NDCA would deter a defendant in Ferizi's position from moving for compassionate release

Similarly, Ferizi has not shown that the prosecution was retaliation for the exercise of his right to seek compassionate release. Rather, it is in recognition of the fact that if released, Ferizi's prior hacking crimes to aid ISIS and endanger American citizens, and his crimes committed in custody, show that he continues to present an extraordinary danger to the United States. The fact that Ferizi allegedly sought

1    to profit from the fruits of his prior hacking while in custody shows that he remains a grave danger to the

2    United States, and that his prior conviction did not dissuade him from attempting to commit more

3    crimes.  It is also highly relevant that the apparently stolen material Ferizi attempted to provide to his

4    brother includes the names and private information of American and Israeli citizens.  If Ferizi attempted

5    to commit crimes while in maximum security prison, it is a safe bet that he will do so when he is freed to

6    Kosovo where he cannot be supervised by the United States.

7            The two cases on which Ferizi principally relies are factually distinguishable from this case.  In

8    *United States v. Jenkins*, 504 F.3d 694, 697, 700 (9th Cir. 2007), the government had twice declined to

9    prosecute the defendant despite an "open and shut" case against her for alien smuggling.  At her

10    subsequent trial on separate charges of marijuana importation, however, the defendant testified that she

11    believed her vehicle contained undocumented aliens, not marijuana, "because she had been paid on two

12    previous occasions to smuggle aliens." *Id.* at 697.  While the jury was deliberating, the government then

13    charged the defendant with the prior incidents of alien smuggling, which the Ninth Circuit held

14    established a presumption of vindictiveness, rejecting the government's explanation that it had "'no

15    choice but to bring charges'" after the defendant admitted to them in open court. *Id.* at 701.

16            Unlike in *Jenkins*, where the government "brought the alien smuggling charges only because

17    Jenkins admitted to them during the marijuana importation trial," 504 F.3d at 701, Ferizi's

18    compassionate release motion made no mention whatsoever of the conduct underlying his instant

19    charges.  Therefore, it is not as though the government here is punishing Ferizi for anything he said,

20    whereas the Ninth Circuit found in *Jenkins* the presumption of vindictiveness after Jenkins testified in

21    her own defense.  Especially considering the unusual circumstances of this case, the government's

22    charging decision here, unlike in *Jenkins*, did not risk "chilling the exercise of [legal] rights by other

23    defendants who must make their choices under similar circumstances in the future." *See id.* at 700.

24            Similarly, in *United States v. Groves*, 571 F.2d 450, 451–52 (9th Cir. 1978), the Ninth Circuit

25    held that a presumption of vindictiveness arose when the government indicted the defendant for a

26    marijuana offense after he successfully moved to dismiss a cocaine charge based on a violation of the

27    Speedy Trial Act.  But *Groves* is distinguishable in at least two respects.  First, the second indictment in

28    that case followed the exercise of a procedural right during an ongoing prosecution, not the reduction of

a defendant's sentence after a successful prosecution, as here. Second, the Ninth Circuit concluded in *Groves* that the government's explanation for the second indictment—that the defendant had failed to abide by a cooperation agreement with the government—was pretextual. *See id.* at 455 ("[I]t becomes clear that [the government] was not relying upon the breach of any such agreement to justify the felony indictment."). Here, in contrast, the instant charges would prevent Ferizi from continuing his terrorist-related activities beyond the reach of U.S. law, a legitimate basis unrelated to his compassionate release motion.

### C. The NDCA Prosecution of Ferizi Is Distinct From his EDVA Conviction and Sentencing

The prosecution of Ferizi in the case before this court concerns alleged criminal conduct that Ferizi committed after he was convicted and sentenced in the EDVA and while he was incarcerated. While there is some overlap of evidence in the two cases, the offense conduct in this case is new and distinct from the prior charges. In the EDVA case, Ferizi admitted that he breached a database he was not authorized to enter, downloaded sensitive information, and provided it to ISIS. In the instant case, Ferizi is accused of maintaining stolen material on his personal Google Drive account and, from prison, giving access to his brother to download it.

A presumption of vindictiveness rarely arises when "the second charge is unrelated to the first." *United States v. Martinez*, 785 F.2d 663, 669 (9th Cir. 1986). In *Martinez*, the defendant was indicted for making false statements to immigration officials the District of Arizona after he was acquitted on letter bombing charges in the District of Colorado. The Ninth Circuit reversed the district court's decision to dismiss the Arizona indictment, not for actual vindictiveness, but for the government's failure to rebut a presumption of vindictiveness.

The Ninth Circuit in *Martinez* acknowledged that the cases prohibiting vindictive prosecution reflect a concern with both the actual vindictiveness that a defendant might face and the possibility that the conduct in question might deter future defendants from exercising their constitutional rights. The Court found that it was the second concern that appeared to lie behind the position taken by the district court in *Martinez*. The Court observed that this concern, however, must not be uncoupled from the possibility of vindictiveness; it is legitimate only when vindictiveness is a strong possibility. *Id. citing United States v. Goodwin*, 457 U.S. 368, 373, 102 S.Ct. 2485, 2488–89 (1982) (emphasizing that, in

cases alleging post-trial vindictiveness, the Court " 'presume[s]' an improper vindictive motive ... only in cases in which a reasonable likelihood of vindictiveness exists").

The Court noted:

If the additional charge "aris[es] out of the same nucleus of operative facts as the original charge," a presumption of vindictiveness is raised. *United States v. Robison*, 644 F.2d 1270, 1272 (9th Cir.1981). **If, however, the second charge is unrelated to the first, the presumption does not arise.** *See id*. at 1273. In *United States v. Allen*, 699 F.2d 453 (9th Cir.1982), we held that **the government's delay in bringing an indictment while it awaited "a disposition of an unrelated criminal prosecution" in a different district was insufficient to raise the presumption of vindictiveness**. See *id*. at 460–61.3 As we remarked in *United States v. Griffin*, 617 F.2d 1342 (9th Cir.), cert. denied, 449 U.S. 863, 101 S.Ct. 167, 66 L.Ed.2d 80 (1980):

Nothing in *Blackledge [v. Perry]* presumed to give the defendant a free ride for separate crimes he may have committed, or to prevent a prosecutor from bringing new charges as a result of **changed or altered circumstances which properly bear on prosecutorial discretion.**

*Id*. at 1348 (emphasis added).

Applying *Allen,* the Ninth Circuit held that because the charges of letter bombing and making false statements were unrelated, *Martinez* was an inappropriate case in which to invoke a presumption of vindictiveness. Assuming, then, that the sole motive for bringing the Arizona indictment was the Colorado acquittal, the court in Martinez found that such a motive should not raise the presumption of vindictiveness, but rather was a legitimate prosecutorial consideration. *Martinez,* at 670.

This conclusion was not impaired by the fact of the long delay between the original Arizona indictment and the indictment dismissed by the trial court in *Martinez*. *Id*. The latter indictment did follow closely on the heels of the Colorado acquittal and was due to a prolonged FBI investigation and the discovery of Martinez's perjury. *Id*. The Supreme Court has indicated that prosecutors are entitled to great leeway in their reasons for investigative delay. *See United States v. Lovasco*, 431 U.S. 783, 792–96, 97 S.Ct. 2044, 2049–52 (1977). The Ninth Circuit saw no reason in *Martinez* to set time limits for prosecutorial investigations beyond the limits that are already established by statutes of limitations. The Court, therefore, reversed the district court's dismissal of the indictment in *Martinez*.

Similarly, in the case before this Court, the presumption of vindictiveness should not apply and there is no evidence of actual vindictiveness because the government did not seek by this indictment to

1  deter Ferizi, or other defendants, from seeking compassionate release.  Rather, the government is

2  seeking to protect the citizens of the United States from the danger posed to them by the release of Ferizi

3  when he has continued to commit crimes after his conviction in the EDVA.

4  **IV.    An Evidentiary Hearing is Not Warranted and the Court Should Not Order Discovery**

5         Ferizi's motion should be denied without an evidentiary hearing.  The vindictive prosecution

6  claim rests on the fact that because Ferizi was charged in the NDCA after his compassionate release

7  motion was granted, that the NDCA charges must have been vindictive.  The mere fact that this

8  prosecution followed the exercise of certain procedural rights in another case is insufficient to raise the

9  appearance of vindictiveness; no threshold showing exists to trigger the an inquiry into the prosecutor's

10  actual motives.  *United States v. Robison*, 644 F.2d 1270, 273 (9th Cir. 1981). This is not a case in which

11  the prosecutor reindicted Ferizi on a more serious charge after the defendant asserted constitutional

12  rights during an ongoing prosecution.  Nor is this a case where the government charged Ferizi to avoid

13  an added burden.  Instead, the defendant has provided the Court with no proof in this case that the

14  prosecutor proceeded against Ferizi because he had exercised a constitutional or statutory right.  Rather,

15  Ferizi was charged because of the danger posed by his release.  In the absence of a strong showing by

16  the defendant of the causal connection between the exercise of the right and the NDCA prosecution

17  (which he has failed to do), the Court should decline to order further inquiry.

18         There also are no grounds for the very broad discovery requests that Ferizi has made.  In *United*

19  *States v. Armstrong*, 517 U.S. 456, 462 (1996), the Supreme Court established that Fed. R. Crim. P. 16

20  does not automatically allow discovery on affirmative defenses like vindictive prosecution.  *See also*

21  *United States v. Feathers*, 2016 WL 7337518, at *13 (N.D. Cal. Dec. 19, 2016) (citing *Armstrong* for

22  proposition that "Rule 16 discovery acts as a 'shield' rather than a 'sword' against the prosecution").

23  Rather, a defendant may be entitled to discovery "[i]n limited circumstances" if he "establishes a prima

24  facie showing of a likelihood of vindictiveness tending to show the essential elements of the defense."

25  *United States v. One 1985 Mercedes*, 917 F.2d 415, 421 (9th Cir. 1990); *accord United States v.*

26  *Martinez*, 105 F. App'x 190, 193 (9th Cir. 2004).  This is a "rigorous" standard, meant to serve as a

27  "'significant barrier to the litigation of insubstantial claims.'"  *United States v. Sanders*, 211 F.3d 711,

28  717 (2d Cir. 2000) (quoting *Armstrong*, 517 U.S. at 468); *accord United States v. Yagman*, 2007 WL

1   9724368, at *4 (C.D. Cal. May 3, 2007).  The facts of this case fail to meet the standard.  Thus, Ferizi's

2   discovery requests should be denied.  *See, e.g., United States v. Kuburovich*, 852 Fed.Appx. 291, 293

3   (9th Cir. 2021)

4   **V.      CONCLUSION**

5           For the foregoing reasons, the Court should deny Ferizi's motion to dismiss for vindictive

6   prosecution, as well as deny Ferizi's requests for an evidentiary hearing and discovery.

7

8   DATED:  March 1, 2022                                      Respectfully submitted,

9                                                              STEPHANIE M. HINDS
10                                                             United States Attorney

11                                                             _____/s/_____
12                                                             ROSS WEINGARTEN
                                                               Assistant United States Attorney